MLP,NOCNST

# U.S. District Court
## Southern District of Illinois (East St. Louis)
## CIVIL DOCKET FOR CASE #: 3:21-cv-00229-NJR

Runyon v. Syngenta Crop Protection, LLC et al
Assigned to: Chief Judge Nancy J. Rosenstengel
Related Case: 3:21-cv-00211-NJR
Cause: 28:1332 Diversity-Personal Injury

Date Filed: 02/26/2021
Jury Demand: Plaintiff
Nature of Suit: 365 Personal Inj. Prod. Liability
Jurisdiction: Diversity

## Plaintiff

**Terry Runyon**

represented by **Stephen M. Tillery**
Korein Tillery - St. Louis
One U.S. Bank Plaza
505 North 7th Street
Suite 3600
St. Louis, MO 63101-1625
314-241-4844
Fax: 314-241-3525
Email: stillery@koreintillery.com
*ATTORNEY TO BE NOTICED*

V.

## Defendant

**Syngenta Crop Protection LLC**

represented by **Michael J. Nester**
Donovan Rose Nester, P.C.
15 North 1st Street
Suite A
Belleville, IL 62220
618-212-6500
Fax: 618-212-6501
Email: mnester@drnpc.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

## Defendant

**Syngenta AG**

represented by **Michael J. Nester**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

## Defendant

**Chevron U.S.A., Inc.**

| Date Filed | # | Docket Text |
|---|---|---|
| 02/26/2021 | 1 | COMPLAINT against All Defendants ( Filing fee $ 402 receipt number 0754-4414389.), |

| | | |
|---|---|---|
| | | filed by Terry Runyon. (Attachments: # 1 Civil Cover Sheet)(Tillery, Stephen) (Entered: 02/26/2021) |
| 02/26/2021 | 2 | NOTICE of Appearance by Stephen M. Tillery on behalf of Terry Runyon (Tillery, Stephen) (Entered: 02/26/2021) |
| 03/01/2021 | 3 | NOTICE OF INITIAL ASSIGNMENT TO A U.S. MAGISTRATE JUDGE: This case has been randomly assigned to United States Magistrate Judge Reona J. Daly pursuant to Administrative Order No. 257. The parties are advised that their consent is required if the assigned Magistrate Judge is to conduct all further proceedings in the case, including trial and final entry of judgment pursuant to 28 U.S.C. 636(c) and Federal Rule of Civil Procedure 73. As set forth in Administrative Order No. 257, each party will be required to file a Notice and Consent to Proceed Before a Magistrate Judge Jurisdiction form indicating consent or nonconsent to the jurisdiction of the assigned Magistrate Judge. If all parties do not consent to the Magistrate Judge's jurisdiction, the case will be randomly assigned to a district judge for all further proceedings and the parties cannot later consent to reassignment of the case to a magistrate judge. The parties are further advised that they are free to withhold consent without adverse substantive consequences. Within 21 days of this Notice, the following party or parties must file the attached form indicating consent to proceed before the assigned Magistrate Judge or an affirmative declination to consent: Terry Runyon. A link regarding the magistrate judges in this district is attached for your convenience: http://www.ilsd.uscourts.gov/documents/BenefitsofConsent.pdf. All future documents must bear case number 21-229-RJD. Refer to Civil/Removal Case Processing Requirements, found on the ILSD website, for further service information. Consent due by 3/22/2021 (trb)THIS TEXT ENTRY IS AN ORDER OF THE COURT. NO FURTHER DOCUMENTATION WILL BE MAILED. (Entered: 03/01/2021) |
| 03/02/2021 | 4 | ORDER REASSIGNING CASE. Case reassigned to Magistrate Judge Mark A. Beatty for all further proceedings. Magistrate Judge Reona J. Daly no longer assigned to case. Signed by Magistrate Judge Reona J. Daly on 3/2/2021. (lmo) (Entered: 03/02/2021) |
| 03/18/2021 | 5 | ORDER: This matter comes before the Court for case management. Chief District Judge Nancy J. Rosenstengel is presiding over Kearns v. Syngenta Crop Protection LLC, Case No. 21-cv-278-NJR ("Kearns"). The instant action involves the same issues and the same Defendants as Kearns. Cognizant of the Seventh Circuit's position that related cases filed within the same U.S. District Court should be transferred to a single District Judge, see Smith v. Check-N-Go of Illinois, 200 F.3d 511, 513, n. 1 (7th Cir. 1999); Blair v. Equifax Check Serv., 181 F.3d 832, 839 (7th Cir. 1999), and having consulted with Chief Judge Rosenstengel, the undersigned Judge TRANSFERS this case to Chief Judge Rosenstengel for further proceedings. Signed by Magistrate Judge Mark A. Beatty on 3/18/21. (klh2)THIS TEXT ENTRY IS AN ORDER OF THE COURT. NO FURTHER DOCUMENTATION WILL BE MAILED. (Entered: 03/18/2021) |
| 03/19/2021 | 6 | Case reassigned to Chief Judge Nancy J. Rosenstengel. Magistrate Judge Mark A. Beatty no longer assigned to the case. All future documents must bear case number 21-cv-229-NJR. (tba)THIS TEXT ENTRY IS AN ORDER OF THE COURT. NO FURTHER DOCUMENTATION WILL BE MAILED. (Entered: 03/19/2021) |
| 03/22/2021 | 7 | WAIVER OF SERVICE Returned Executed by All Plaintiffs. Syngenta AG waiver sent on 3/3/2021, answer due 5/3/2021; Syngenta Crop Protection LLC waiver sent on 3/3/2021, answer due 5/3/2021. (Tillery, Stephen) (Entered: 03/22/2021) |
| 03/22/2021 | 8 | WAIVER OF SERVICE Returned Executed by All Plaintiffs. Chevron U.S.A., Inc. waiver sent on 3/4/2021, answer due 5/3/2021. (Tillery, Stephen) (Entered: 03/22/2021) |
| 03/23/2021 | 9 | NOTICE of Appearance by Michael J. Nester on behalf of Syngenta AG, Syngenta Crop Protection LLC (Nester, Michael) (Entered: 03/23/2021) |

| PACER Service Center | | | |
|---|---|---|---|
| **Transaction Receipt** | | | |
| 04/07/2021 12:03:05 | | | |
| **PACER Login:** | patrickluff:4569241:0 | **Client Code:** | |
| **Description:** | Docket Report | **Search Criteria:** | 3:21-cv-00229-NJR |
| **Billable Pages:** | 2 | **Cost:** | 0.20 |

IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| TERRY RUNYON, | |
| Plaintiff, | |
| v. | Case No. 3:21-cv-00229 |
| SYNGENTA CROP PROTECTION LLC, SYNGENTA AG, and CHEVRON U.S.A., INC., | JURY TRIAL DEMANDED |
| Defendants. | |

## **COMPLAINT**

Plaintiff, TERRY RUNYON, complaining of Defendants, SYNGENTA CROP PROTECTION LLC, SYNGENTA AG, and CHEVRON U.S.A., INC., states:

### I.     Summary of the case

1.     Paraquat is a synthetic chemical compound[1] that since the mid-1960s has been developed, registered, manufactured, distributed, sold for use, and used as an active ingredient in herbicide products ("paraquat products") developed, registered, formulated, distributed, and sold for use in the United States ("U.S."), including the State of Illinois ("Illinois").

---

[1] Paraquat dichloride (EPA Pesticide Chemical Code 061601) or paraquat methosulfate (EPA Pesticide Chemical Code 061602).

2.     From approximately May 1964 through approximately June 1981, Imperial Chemical Industries Limited ("ICI Limited") and certain ICI Limited subsidiaries,[2] and from approximately June 1981 through approximately September 1986, Imperial Chemical Industries PLC ("ICI PLC") and certain ICI PLC subsidiaries, each of which was a predecessor[3] of Defendant SYNGENTA AG ("SAG") and/or Defendant SYNGENTA CROP PROTECTION LLC ("SCPLLC"), were engaged, directly, acting in concert with each other, and/or acting in concert with Chevron Chemical Company, previously known as California Chemical Company ("CHEVRON"), in the business of developing, registering, manufacturing, distributing, and selling paraquat for use as an active ingredient in paraquat products, and developing, registering, formulating, and distributing paraquat products, for sale and use in the U.S., including Illinois ("the U.S. paraquat business").

3.     From approximately May 1964 through approximately September 1986, CHEVRON, a predecessor of Defendant CHEVRON U.S.A., INC. ("CUSA"), was

---

[2] As used in this Complaint, "subsidiary" means a corporation or other business entity's wholly-owned subsidiary that is or formerly was engaged in the U.S. paraquat business directly or acting in concert with others.

[3] As used in this Complaint, "predecessor" means a corporation or other business entity or subsidiary thereof, to which a Defendant is a successor by merger, continuation of business, or assumption of liabilities, that formerly was engaged in the U.S. paraquat business directly or acting in concert with others.

engaged, directly and/or acting in concert with ICI,[4] in all aspects of the U.S. paraquat business.

4. Between approximately May 1964 and approximately September 1986, ICI manufactured and sold to CHEVRON paraquat ("ICI-CHEVRON paraquat") for use by CHEVRON, and others to which CHEVRON distributed it, as an active ingredient in paraquat products that CHEVRON and others formulated and distributed for sale and use in the U.S., including Illinois ("ICI-CHEVRON paraquat products").

5. From approximately September 1986 through the present, ICI PLC and certain ICI PLC subsidiaries (including predecessors of SCPLLC) initially, then other SAG predecessors and certain subsidiaries of each (including predecessors of SCPLLC), and most recently SAG and certain SAG subsidiaries (including SCPLLC), have been engaged, directly and/or acting in concert with each other, in all aspects of the U.S. paraquat business.

6. From approximately September 1986 through the present, ICI PLC and certain ICI PLC subsidiaries (including predecessors of SCPLLC) initially, then other SAG predecessors and certain subsidiaries of each (including predecessors of SCPLLC), and most recently SAG and certain SAG subsidiaries (including SCPLLC), have manufactured paraquat ("ICI-SYNGENTA paraquat") for their own use, and for use by

---

[4] As used in this Complaint, "ICI" means ICI Limited and various ICI Limited subsidiaries through approximately June 1981 and ICI PLC and various ICI PLC subsidiaries thereafter.

others to which they distributed it, as an active ingredient in paraquat products that

SCPLLC and its predecessors and others have distributed for sale and use in the U.S.,

including Illinois ("ICI-SYNGENTA paraquat products").

7.     Plaintiff TERRY RUNYON purchased and used in Illinois ICI-CHEVRON

paraquat products and/or ICI-SYNGENTA paraquat products (collectively,

"Defendants' paraquat products").

8.     Plaintiff TERRY RUNYON used Defendants' paraquat products regularly

and frequently over a period of many years.

9.     Plaintiff TERRY RUNYON suffers from Parkinson's disease caused by

many years of regular, frequent, prolonged exposure to paraquat from Defendants'

paraquat products.

10.     Plaintiff brings this case to recover from Defendants, under the following

alternative theories of liability, compensation for injuries and damages caused by the

exposure of Plaintiff TERRY RUNYON to paraquat from Defendants' paraquat

products, plus costs of suit: strict product liability—design defect; strict product

liability—failure to warn; negligence and willful and wanton conduct; public nuisance;

violation of the Illinois Consumer Fraud and Deceptive Business Practices Act; and

breach of the implied warranty of merchantability. Plaintiff also seek punitive damages

under Illinois common law and punitive damages and reasonable attorney's fees under

the Illinois Consumer Fraud and Deceptive Business Practices Act.

## II.     Parties

### A.     Plaintiff

11.     Plaintiff TERRY RUNYON is a citizen of the State of Illinois and resides in Noble, Illinois, which is in Richland County.

### B.     Defendants

12.     SCPLLC is a Delaware limited liability company with its principal place of business in Greensboro, North Carolina. SCPLLC is a wholly-owned subsidiary of Defendant SAG.

13.     SAG is a foreign corporation with its principal place of business in Basel, Switzerland.

14.     CUSA is a Pennsylvania corporation with its principal place of business in San Ramon, California.

## III.     Subject matter jurisdiction

15.     This Court has subject matter jurisdiction over this action because diversity jurisdiction exists under 28 U.S.C. § 1332(a)(3).

16.     The matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs, because Plaintiff seeks an amount that exceeds this sum or value on each of his claims against each Defendant.

17.     Complete diversity exists because this is an action between citizens of different states in which a citizen or subject of a foreign state is an additional party, in that:

      a.     Plaintiff is a citizen of the State of Illinois;

      b.     SCPLLC is a citizen of the States of Delaware and North Carolina;

      c.     CUSA is a citizen of the States of Pennsylvania and California; and

      d.     SAG is a citizen or subject of the nation of Switzerland.

## IV.     Personal jurisdiction

18.     This Court has personal jurisdiction over each of the Defendants in this diversity case because a state court in the State of Illinois would have such jurisdiction under 735 ILCS 5/2-209, in that:

      a.     Over a period of two (Chevron) to six (Syngenta) decades, each Defendant and/or its predecessor(s), together with those with whom they were acting in concert, manufactured paraquat for use as an active ingredient in paraquat products, distributed paraquat to formulators of paraquat products, formulated paraquat products, marketed paraquat products to the Illinois agricultural community, and/or distributed paraquat products, intending that such products regularly would be, and knowing they regularly were, sold and used in the State of Illinois;

      b.     Plaintiff's claims against each Defendant arise out of these contacts between the Defendant and/or its predecessor(s), together with those with whom they were acting in concert, with the State of Illinois; and

      c.     These contacts between each Defendant and/or its predecessors, together with those with whom they were acting in concert, and the State of Illinois, were so regular, frequent, and sustained as to provide fair warning that it might be hauled into court there, such that requiring it to defend this action in the State of Illinois does not offend traditional notions of fair play and substantial justice.

## V.    Venue

19.    Venue is proper in this district under 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to the claim occurred in this district, in that Plaintiff's claims arise from injuries caused by the exposure of Plaintiff TERRY RUNYON to paraquat from paraquat products that were distributed and sold for use in this district, were purchased or purchased for use in this district, and were being used in this district when the exposures that caused the injuries occurred.

## VI.    Allegations common to all causes of action

### A.    Defendants and their predecessors

#### 1.    Syngenta Crop Protection LLC and Syngenta AG

20.    SAG is the successor in interest to the crop-protection business of each of its predecessors, AstraZeneca PLC ("AstraZeneca"), Zeneca Group PLC ("Zeneca Group"), ICI PLC, ICI Limited, and Plant Protection Limited ("PP Limited") and their respective crop-protection subsidiaries (collectively, "SAG's predecessors"), in that:

a.    SAG, and each of SAG's predecessors, was the result of a corporate name change by, de facto consolidation or merger of, or mere continuation of, its immediate predecessor(s); and/or

b.    SAG has expressly or impliedly agreed to assume any liability on claims arising from the historical operation of the crop-protection business of each of SAG's predecessors.

21.    SCPLLC is the successor in interest to the crop-protection business of each of its predecessors, Syngenta Crop Protection, Inc. ("SCPI"), Zeneca Ag Products, Inc.

("Zeneca Ag"), Zeneca, Inc. ("Zeneca"), ICI Americas, Inc. ("ICIA"), ICI United States, Inc. ("ICI US"), and ICI America Inc. ("ICI America") (collectively, "SCPLLC's predecessors"), in that:

       a.      SCPLLC, and each of SCPLLC's predecessors, was the result of a corporate name change by, de facto consolidation or merger of, or mere continuation of, its immediate predecessor(s); and/or

       b.      SCPLLC has expressly or impliedly agreed to assume any liability on claims arising from the historical operation of the crop-protection business of each of SCPLLC's predecessors.

22.    At all relevant times, SCPLLC, SCPI, Zeneca Ag, Zeneca, ICIA, ICI US, and/or ICI America was a wholly-owned U.S. crop-protection subsidiary of SAG or a predecessor of SAG.

23.    At all relevant times, PP Limited was a wholly-owned U.K. crop-protection subsidiary of ICI Limited, an unincorporated division of ICI Limited, or an unincorporated division of ICI PLC.

24.    At all relevant times, SAG and its predecessors exercised a degree of control over their crop-protection subsidiaries so unusually high that these subsidiaries were their agents or alter egos.

**2.    Chevron U.S.A., Inc.**

25.    CUSA is the successor in interest to CHEVRON's crop-protection business, in that it has expressly assumed any liability on claims arising from the historical operation of that business.

**B.      Defendants' and their predecessors' involvement in the U.S. paraquat business**

26.      ICI Limited discovered the herbicidal properties of paraquat in the mid-1950s; developed herbicide formulations containing paraquat as an active ingredient in the early 1960s; and produced the first commercial paraquat formulation, which it registered it in England and introduced in certain markets under the brand name GRAMOXONE®, in 1962.

27.      ICI Limited was awarded a U.S. patent on herbicide formulations containing paraquat as an active ingredient in 1962.

28.      In May 1964, ICI Limited, PP Limited, and CHEVRON entered into an agreement for the distribution of paraquat in the U.S. and the licensing of certain paraquat-related patents, trade secrets, and other intellectual property ("paraquat licensing and distribution agreement").

29.      As a result of the May 1964 paraquat licensing and distribution agreement, paraquat became commercially available for use in the U.S. in or about 1965.

30.      In April 1975, ICI Limited, ICI US, and CHEVRON entered into a new paraquat licensing and distribution agreement that superseded the May 1964 agreement.

31.      In November 1981, ICIA, CHEVRON, and ICI PLC entered into a new paraquat licensing and distribution agreement, effective January 1982, which superseded in part and amended in part the April 1975 agreement.

32.     From approximately May 1964 through approximately September 1986, pursuant to these paraquat licensing and distribution agreements, ICI and CHEVRON acted in concert in all aspects of the U.S. paraquat business.

33.     In September 1986, ICI and CHEVRON entered into an agreement terminating their paraquat licensing and distribution agreement.

34.     Under the September 1986 termination agreement, ICI paid CHEVRON for the early termination of CHEVRON's rights under their paraquat licensing and distribution agreement.

35.     Although the September 1986 termination agreement gave ICI the right to buy, or exchange for ICI-labeled paraquat products, CHEVRON-labeled paraquat products that CHEVRON had already sold to its distributors, CHEVRON-labeled paraquat products continued to be sold for use in the U.S. after this agreement for some period of time unknown to Plaintiff.

36.     SAG, SAG's predecessors, and subsidiaries of SAG and its predecessors (collectively, "SYNGENTA"), have at all relevant times manufactured more paraquat used as an active ingredient in paraquat products formulated and distributed for sale and use in the U.S., including Illinois, than all other paraquat manufacturers combined.

37.     From the mid-1960s through at least 1986, SYNGENTA (as ICI) was the only manufacturer of paraquat used as an active ingredient in paraquat products formulated and distributed for sale and use in the U.S., including Illinois.

10

38.     From approximately September 1986 through the present, SYNGENTA

has:

    a.      manufactured paraquat for use as an active ingredient in paraquat
    products formulated and distributed for sale and use in the U.S., including
    Illinois;

    b.      distributed paraquat for use as an active ingredient in paraquat
    products formulated and distributed for sale and use in the U.S., including
    Illinois;

    c.      formulated paraquat products distributed for sale and use in the
    U.S., including Illinois; and

    d.      distributed paraquat products for sale and use in the U.S.,
    including Illinois.

**C.      The use of paraquat products and Defendants' knowledge thereof**

39.     Defendants' paraquat products have been used in the U.S. to kill broadleaf

weeds and grasses before the planting or emergence of more than 100 field, fruit,

vegetable, and plantation crops, to control weeds in orchards, and to desiccate (dry)

plants before harvest. At all relevant times, the use of Defendants' paraquat products

for these purposes was intended or directed by or reasonably foreseeable to, and was

known to or foreseen by, SYNGENTA and CHEVRON.

40.     Defendants' paraquat products were commonly used multiple times per

year on the same ground, particularly when used to control weeds in orchards and in

farm fields where multiple crops are planted in the same growing season or year. At all

relevant times, the use of Defendants' paraquat products in this manner was intended

11

or directed by or reasonably foreseeable to, and was known to or foreseen by, SYNGENTA and CHEVRON.

41.     Defendants' paraquat products were typically sold to end users in the form of liquid concentrates that were then diluted with water in the tank of a sprayer and applied by spraying the diluted product onto target weeds. At all relevant times, the use of Defendants' paraquat products in this manner was intended or directed by or reasonably foreseeable to, and was known to or foreseen by, SYNGENTA and CHEVRON.

42.     Defendants' paraquat products were typically formulated with a surfactant or surfactants, and/or a surfactant, surfactant product, or "crop oil," which typically contains one or more surfactants, was commonly added by users of Defendants' products, to increase the ability of paraquat to stay in contact with and penetrate the leaves of target plants and enter plant cells. At all relevant times, the use of Defendants' paraquat products as so formulated and/or with such substances added was intended or directed by or reasonably foreseeable to, and was known to or foreseen by, SYNGENTA and CHEVRON.

43.     Knapsack sprayers, hand-held sprayers, aircraft (*i.e.*, crop dusters), trucks with attached pressurized tanks, and tractor-drawn pressurized tanks, were commonly used to apply Defendants' paraquat products. At all relevant times, the use of such

equipment for that purpose was intended or directed by or reasonably foreseeable to, and was known to or foreseen by, SYNGENTA and CHEVRON.

**D.  Exposure to paraquat and Defendants' knowledge thereof**

44.  When Defendants' paraquat products were used in a manner that was intended and directed by or reasonably foreseeable to, and was known to or foreseen by, SYNGENTA and CHEVRON, persons who used them and others nearby were commonly exposed to paraquat while it was being mixed and loaded into the tanks of sprayers, including as a result of spills, splashes, and leaks. At all relevant times, it was reasonably foreseeable to, and known to or foreseen by, SYNGENTA and CHEVRON that such exposure commonly would and did occur and would and did create a substantial risk of harm to the persons exposed.

45.  When Defendants' paraquat products were used in a manner that was intended and directed by or reasonably foreseeable to, and was known to or foreseen by, SYNGENTA and CHEVRON, persons who sprayed them, and others nearby while they were being sprayed or when they recently had been sprayed, commonly were exposed to paraquat, including as a result of spray drift (the movement of herbicide spray droplets from the target area to an area where herbicide application was not intended, typically by wind) and contact with sprayed plants. At all relevant times, it was reasonably foreseeable to, and known to or foreseen by, SYNGENTA and

13

CHEVRON, that such exposure commonly would and did occur and would and did create a substantial risk of harm to the persons exposed.

46.     When Defendants' paraquat products were used in a manner that was intended and directed by or reasonably foreseeable to, and was known to or foreseen by, SYNGENTA and CHEVRON, persons who used them and other persons nearby commonly were exposed to paraquat, including as a result of spills, splashes, and leaks, while equipment used to spray it was being emptied or cleaned or clogged spray nozzles, lines, or valves were being cleared. At all relevant times, it was reasonably foreseeable to, and was known to or foreseen by, SYNGENTA and CHEVRON that such exposure commonly would and did occur and would and did create a substantial risk of harm to the persons exposed.

47.     At all relevant times, it was reasonably foreseeable to, and was known to or foreseen by, SYNGENTA and CHEVRON that when Defendants' paraquat products were used in a manner that was intended and directed by or reasonably foreseeable to, and was known to or foreseen by, SYNGENTA and CHEVRON, and people were exposed to paraquat as a result, paraquat could and did enter the human body via absorption through or penetration of the skin, mucous membranes, and other epithelial tissues, including tissues of the mouth, nose and nasal passages, trachea, and conducting airways, particularly where cuts, abrasions, rashes, sores, or other tissue

14

damage was present, and that paraquat that entered the human body in one or more of these ways would and did create a substantial risk of harm to people so exposed.

48.     At all relevant times, it was reasonably foreseeable to, and was known to or foreseen by, SYNGENTA and CHEVRON that when Defendants' paraquat products were used in a manner that was intended and directed by or reasonably foreseeable to, and was known to or foreseen by, SYNGENTA and CHEVRON, and people were exposed to paraquat as a result, paraquat could and did enter the human body via respiration into the lungs, including the deep parts of the lungs where respiration (gas exchange) occurs, and that paraquat that entered the human body in this way would and did create a substantial risk of harm to people so exposed.

49.     At all relevant times, it was reasonably foreseeable to, and was known to or foreseen by, SYNGENTA and CHEVRON that when Defendants' paraquat products were used in a manner that was intended and directed by or reasonably foreseeable to, and was known to or foreseen by, SYNGENTA and CHEVRON, and people were exposed to paraquat as a result, paraquat could and did enter the human body via ingestion into the digestive tract of small droplets swallowed after entering the mouth, nose, or conducting airways, and that paraquat that entered the human body in this way would and did create a substantial risk of harm to people so exposed.

50.     At all relevant times, it was reasonably foreseeable to, and was known to or foreseen by, SYNGENTA and CHEVRON that when Defendants' paraquat products

15

were used in a manner that was intended and directed by or reasonably foreseeable to, and was known to or foreseen by, SYNGENTA and CHEVRON, and people were exposed to paraquat as a result, paraquat that entered the human body via ingestion into the digestive tract could and did enter the enteric nervous system (the part of the nervous system that governs the function of the gastrointestinal tract), and that paraquat that entered the enteric nervous system would and did create a substantial risk of harm to people so exposed.

51.     At all relevant times, it was reasonably foreseeable to, and was known to or foreseen by, SYNGENTA and CHEVRON that when Defendants' paraquat products were used in a manner that was intended and directed by or reasonably foreseeable to, and was known to or foreseen by, SYNGENTA and CHEVRON, and people were exposed to paraquat as a result, paraquat that entered the human body, whether via absorption, respiration, or ingestion, could and did enter the bloodstream, and that paraquat that entered the bloodstream would and did create a substantial risk of harm to people so exposed.

52.     At all relevant times, it was reasonably foreseeable to, and was known to or foreseen by, SYNGENTA and CHEVRON that when Defendants' paraquat products were used in a manner that was intended and directed by or reasonably foreseeable to, and was known to or foreseen by, SYNGENTA and CHEVRON, and people were exposed to paraquat as a result, paraquat that entered the bloodstream could and did

enter the brain, whether through the blood-brain barrier or parts of the brain not protected by the blood-brain barrier, and that paraquat that entered the brain would and did create a substantial risk of harm to people so exposed.

53.     At all relevant times, it was reasonably foreseeable to, and was known to or foreseen by, SYNGENTA and CHEVRON that when Defendants' paraquat products were used in a manner that was intended and directed by or reasonably foreseeable to, and was known to or foreseen by, SYNGENTA and CHEVRON, and people were exposed to paraquat as a result, paraquat that entered the nose and nasal passages could and did enter the brain through the olfactory bulb (a part of the brain involved in the sense of smell), which is not protected by the blood-brain barrier, and that paraquat that entered the olfactory bulb would and did create a substantial risk of harm to people so exposed.

54.     At all relevant times, it was reasonably foreseeable to, and was known to or foreseen by, SYNGENTA and CHEVRON that when Defendants' paraquat products were used in a manner that was intended and directed by or reasonably foreseeable to, and was known to or foreseen by, SYNGENTA and CHEVRON, and people were exposed to paraquat products that contained surfactants or had surfactants added to them, the surfactants would and did increase the toxicity of paraquat toxicity to humans by increasing its ability to stay in contact with or penetrate cells and cellular structures, including but not limited to the skin, mucous membranes, and other epithelial and

endothelial tissues, including tissues of the mouth, nose and nasal passages, trachea, conducting airways, lungs, gastrointestinal tract, blood-brain barrier, and neurons, and that this would and did increase the already substantial risk of harm to people so exposed.

### E. Parkinson's disease

55.     Parkinson's disease is a progressive neurodegenerative disorder of the brain that affects primarily the motor system, the part of the central nervous system that controls movement.

56.     The characteristic symptoms of Parkinson's disease are its "primary" motor symptoms: resting tremor (shaking movement when the muscles are relaxed), bradykinesia (slowness in voluntary movement and reflexes), rigidity (stiffness and resistance to passive movement), and postural instability (impaired balance).

57.     Parkinson's disease's primary motor symptoms often result in "secondary" motor symptoms such as freezing of gait; shrinking handwriting; mask-like expression; slurred, monotonous, quiet voice; stooped posture; muscle spasms; impaired coordination; difficulty swallowing; and excess saliva and drooling caused by reduced swallowing movements.

58.     Non-motor symptoms—such as loss of or altered sense of smell; constipation; low blood pressure on rising to stand; sleep disturbances; and

depression—are present in most cases of Parkinson's disease, often for years before any of the primary motor symptoms appear.

59.     There is currently no cure for Parkinson's disease; no treatment will stop or reverse its progression, and the treatments most commonly prescribed for its motor symptoms tend to become progressively less effective, and to cause unwelcome side effects, the longer they are used.

60.     The selective degeneration and death of dopaminergic neurons (dopamine-producing nerve cells) in a part of the brain called the substantia nigra pars compacta ("SNpc") is one of the primary pathophysiological hallmarks of Parkinson's disease.

61.     Dopamine is a neurotransmitter (a chemical messenger that transmits signals from one neuron to another neuron, muscle cell, or gland cell) that is critical to the brain's control of motor function (among other things).

62.     The death of dopaminergic neurons in the SNpc decreases the production of dopamine.

63.     Once dopaminergic neurons die, they are not replaced; when enough dopaminergic neurons have died, dopamine production falls below the level the brain requires for proper control of motor function, resulting in the motor symptoms of Parkinson's disease.

64.     The presence of Lewy bodies (insoluble aggregates of a protein called alpha-synuclein) in many of the remaining dopaminergic neurons in the SNpc is another of the primary pathophysiological hallmarks of Parkinson's disease.

65.     Dopaminergic neurons are particularly susceptible to oxidative stress, a disturbance in the normal balance between oxidants present in cells and cells' antioxidant defenses.

66.     Scientists who study Parkinson's disease generally agree that oxidative stress is a major factor in—if not the precipitating cause of—the degeneration and death of dopaminergic neurons in the SNpc and the accumulation of Lewy bodies in the remaining dopaminergic neurons that are the primary pathophysiological hallmarks of Parkinson's disease.

**F.      Paraquat's toxicity**

67.     Paraquat is highly toxic to both plants and animals because it causes and contributes to cause the degeneration and death of living cells in both plants and animals.

68.     Paraquat causes and contributes to cause the degeneration and death of plant and animal cells both directly, through oxidation, and indirectly, through oxidative stress created or aggravated by the "redox cycling" of paraquat; these processes damage lipids, proteins, and nucleic acids, molecules that are essential components of the structures and functions of living cells, and interfere with cellular

functions—in plant cells, with photosynthesis, and in animal cells, with cellular respiration—that are essential to cellular health.

69.     In both plant and animal cells, paraquat undergoes redox cycling that creates or aggravates oxidative stress because of the "redox properties" inherent in paraquat's chemical composition and structure: paraquat is both a strong oxidant and has a high propensity to undergo redox cycling, and to do so repeatedly, in the presence of a suitable reductant and molecular oxygen, both of which are present in all living cells.

70.     The redox cycling of paraquat in living cells creates a "reactive oxygen species" known as superoxide radical, an extremely reactive molecule that can and often does initiate a cascading series of chemical reactions that can and often do create other reactive oxygen species that damage lipids, proteins, and nucleic acids, molecules that are essential components of the structures and functions of living cells.

71.     Because the redox cycling of paraquat can repeat indefinitely in the conditions typically present in living cells, a single molecule of paraquat can trigger the production of countless molecules of destructive superoxide radical. After even a tiny amount of paraquat enters the human brain, paraquat molecules continue to undergo redox cycling and continue to cause damage to human brain cells. This repeated cycling continues in the presence of oxygen and continues to cause the death of dopaminergic neurons, eventually resulting in the onset of Parkinson's disease. However, even after

the onset of Parkinson's disease, the redox cycling continues to cause brain cell damage and death for as long as the victim lives.

72.     The oxidation and redox potentials of paraquat have been known to science since at least the 1930s, and in the exercise of ordinary care should have been known, and were known, to SYNGENTA and CHEVRON at all relevant times.

73.     That paraquat is highly toxic to all living cells—both plant cells and all types of animal cells—has been known to science since at least the mid-1960s, and in the exercise of ordinary care should have been known, and was known, to SYNGENTA and CHEVRON at all relevant times.

74.     The high toxicity of paraquat to living cells of all types creates a substantial risk of harm to persons exposed to paraquat, which SYNGENTA and CHEVRON should have known in the exercise of ordinary care, and did know, at all relevant times.

75.     The same oxidation and redox potentials that make paraquat highly toxic to plant cells and other types of animal cells make paraquat highly toxic to nerve cells, including dopaminergic neurons, and create a substantial risk of neurotoxic harm to persons exposed to paraquat. SYNGENTA and CHEVRON should have known this in the exercise of ordinary care, and did know this, at all relevant times.

**G.      Paraquat and Parkinson's disease**

76.      Although Parkinson's disease is not known to occur naturally in any species other than humans, Parkinson's disease research is often performed using "animal models," in which scientists artificially produce in laboratory animals conditions that show features characteristic of Parkinson's disease in humans.

77.      Paraquat is one of only a handful of toxins that scientists use to produce animal models of Parkinson's disease.

78.      In animal models of Parkinson's disease, hundreds of studies involving various routes of exposure have found that paraquat causes the degeneration and death of dopaminergic neurons in the SNpc, other pathophysiology consistent with that seen in human Parkinson's disease, and motor deficits and behavioral changes consistent with those commonly seen in human Parkinson's disease.

79.      Hundreds of *in vitro* studies (experiments in a test tube, culture dish, or other controlled experimental environment) have found that paraquat causes the degeneration and death of dopaminergic neurons.

80.      Many epidemiological studies (studies of the patterns and causes of disease in defined populations) have found an association between paraquat exposure and Parkinson's disease, including multiple studies finding a two- to five-fold or greater increase in the risk of Parkinson's disease in populations with occupational exposure to paraquat compared to populations without such exposure.

H.      **Paraquat regulation**

81.     The Federal Insecticide, Fungicide, and Rodenticide Act ("FIFRA"), 7 U.S.C. § 136 *et seq*., which regulates the distribution, sale, and use of pesticides within the U.S., requires that pesticides be registered with the EPA prior to their distribution, sale, or use, except as described by FIFRA. 7 U.S.C. 136a(a).

82.     As part of the pesticide registration process, the EPA requires, among other things, a variety of tests to evaluate the potential for exposure to pesticides, toxicity to people and other potential non-target organisms, and other adverse effects on the environment.

83.     As a general rule, FIFRA requires registrants—not the EPA—to perform health and safety testing of pesticides, and the EPA generally does not perform such testing.

84.     The EPA registers (or re-registers) a pesticide if it believes, based largely on studies and data submitted by the registrant, that:

> a.      its composition is such as to warrant the proposed claims for it, 7 U.S.C. § 136a(c)(5)(A);
>
> b.      its labeling and other material required to be submitted comply with the requirements of FIFRA, 7 U.S.C. § 136a(c)(5)(B);
>
> c.      it will perform its intended function without unreasonable adverse effects on the environment, 7 U.S.C. § 136a(c)(5)(C); and
>
> d.      when used in accordance with widespread and commonly recognized practice it will not generally cause unreasonable adverse effects on the environment, 7 U.S.C. § 136a(c)(5)(D).

24

85.     FIFRA defines "unreasonable adverse effects on the environment" as "any unreasonable risk to man or the environment, taking into account the economic, social, and environmental costs and benefits of the use of any pesticide." 7 U.S.C. § 136(bb).

86.     Under FIFRA, "As long as no cancellation proceedings are in effect registration of a pesticide shall be prima facie evidence that the pesticide, its labeling and packaging comply with the registration provisions of [FIFRA]." 7 U.S.C. § 136a(f)(2).

87.     However, FIFRA further provides that "In no event shall registration of an article be construed as a defense for the commission of any offense under [FIFRA]." 7 U.S.C. § 136a(f)(2).

88.     FIFRA further provides that "…it shall be unlawful for any person in any State to distribute or sell to any person… any pesticide which is… misbranded." 7 U.S.C. § 136j(a)(1)(E).

89.     A pesticide is misbranded under FIFRA if, among other things:

    a.      its labeling bears any statement, design, or graphic representation relative thereto or to its ingredients which is false or misleading in any particular, 7 U.S.C. § 136(q)(1)(A);

    b.      the labeling accompanying it does not contain directions for use which are necessary for effecting the purpose for which the product is intended and if complied with, together with any requirements imposed under section 136a(d) of this title, are adequate to protect health and the environment, 7 U.S.C. § 136(q)(1)(F); or

    c.      the label does not contain a warning or caution statement which may be necessary and if complied with, together with any requirements imposed

under section 136a(d) of this title, is adequate to protect health and the environment," 7 U.S.C. § 136(q)(1)(G).

90.     Plaintiff does not seek in this action to impose on Defendants any labeling or packaging requirement in addition to or different from those required under FIFRA; accordingly, any allegation in this complaint that a Defendant breached a duty to provide adequate directions for the use of paraquat or warnings about paraquat, breached a duty to provide adequate packaging for paraquat, or concealed, suppressed, or omitted to disclose any material fact about paraquat or engaged in any unfair or deceptive practice regarding paraquat, is intended and should be construed to be consistent with that alleged breach, concealment, suppression, or omission, or unfair or deceptive practice, having rendered the paraquat "misbranded" under FIFRA.

91.     Plaintiff brings claims and seek relief in this action only under state law. Plaintiff does not bring any claims or seek any relief in this action under FIFRA.

## VII.    Allegations common to specific causes of action[5]

### A.    Strict product liability – design defect

92.     At all relevant times, Defendant and those with whom it was acting in concert were engaged in the U.S. paraquat business.

---

[5] When used in an allegation in section VII or VIII of this Complaint, where the name of the party is not specified: (1) "Defendant" refers to the Defendant or Defendants from whom relief is sought in the Count in which the allegation appears or is incorporated and/or the predecessors of that Defendant or those Defendants; and (2) "Plaintiff" refers to: (a) to the Plaintiff seeking relief in the Count in which the allegation appears or is incorporated, where the Count seeks damages for personal injuries; or (b) to the spouse of the Plaintiff seeking relief in the Count in which the allegation appears or is incorporated, where the Count seeks damages for loss of society or consortium.

93.     At all relevant times, Defendant and those with whom it was acting in concert intended and expected that Defendants' paraquat products[6] would be sold and used in the State of Illinois.

94.     Defendant and those with whom it was acting in concert developed, registered, manufactured, distributed, and sold paraquat for use in formulating Defendants' paraquat products, and developed, registered, formulated and distributed Defendants' paraquat products for sale and use in the U.S., including Illinois.

95.     For many years, Plaintiff used Defendants' paraquat products in Illinois repeatedly and regularly for hours at a time, resulting in the repeated, regular, and prolonged exposure of Plaintiff to paraquat.

96.     At all relevant times, Defendants' paraquat products were in a defective condition that made them unreasonably dangerous when used in a manner that was intended or directed by or reasonably foreseeable to, and was known to or foreseen by, Defendant and those with whom it was acting in concert, in that:

>        a.     they were designed, manufactured, formulated, and packaged such that when so used, paraquat was likely to be inhaled, ingested, and absorbed into the bodies of persons who used them, were nearby while they were being used, or entered fields or orchards where they had been sprayed or areas near where they had been sprayed; and

---

[6] When used in an allegation in section VII or VIII of this Complaint, "Defendants' paraquat products": (1) refers to ICI-CHEVRON paraquat products and/or ICI-SYNGENTA paraquat products when the allegation appears or is incorporated in a Count directed to SCPLLC and SAG; refers only to ICI-CHEVRON paraquat products when the allegation appears or is incorporated in a Count directed to CUSA.

b.  when inhaled, ingested, or absorbed into the bodies of persons who used them, were nearby while they were being used, or entered fields or orchards where they had been sprayed or areas near where they had been sprayed, paraquat was likely to cause or contribute to cause latent, permanent, and cumulative neurological damage, and repeated exposures were likely to cause or contribute to cause clinically significant neurodegenerative disease, including Parkinson's disease, to develop over time and manifest long after exposure.

97.     At all relevant times, this defective condition in Defendants' paraquat products existed when they left the control of Defendant and those with whom it was acting in concert and were placed into the stream of commerce.

98.     At all relevant times, Defendant and those with whom it was acting in concert knew or foresaw that this defective condition of Defendants' paraquat products would create a substantial risk of harm to persons who used them, were nearby while they were being used, or entered fields or orchards where they had been sprayed or areas near where they had been sprayed, but in conscious disregard for the safety of others, including Plaintiff, continued to place them into the stream of commerce.

99.     As a result of this defective condition, Defendants' paraquat products either failed to perform in the manner reasonably to be expected in light of their nature and intended function, or the magnitude of the dangers outweighed their utility.

100.    At all relevant times, Defendants' paraquat products were used in a manner that was intended or directed by or reasonably foreseeable to, and was known to or foreseen by, Defendant and those with whom it was acting in concert.

**B.    Strict product liability – failure to warn**

101.    At all relevant times, Defendant and those with whom it was acting in concert were engaged in the U.S. paraquat business.

102.    At all relevant times, Defendant and those with whom it was acting in concert intended and expected that Defendants' paraquat products would be sold and used in the State of Illinois.

103.    Defendant and those with whom it was acting in concert developed, registered, manufactured, distributed, and sold paraquat for use in formulating Defendants' paraquat products, and developed, registered, formulated and distributed Defendants' paraquat products for sale and use in the U.S., including Illinois.

104.    For many years, Plaintiff used Defendants' paraquat products in Illinois repeatedly and regularly for hours at a time, resulting in the repeated, regular, and prolonged exposure of Plaintiff to paraquat.

105.    At all relevant times, Defendant and those with whom it was acting in concert should have known in the exercise of ordinary care, and did know, that when used in a manner that was intended or directed by or reasonably foreseeable to, and was known to or foreseen by, Defendant and those with whom it was acting in concert:

    a.    Defendants' paraquat products were designed, manufactured, formulated, and packaged such that when so used, paraquat was likely to be inhaled, ingested, and absorbed into the bodies of persons who used them, were nearby while they were being used, or entered fields or orchards where they had been sprayed or areas near where they had been sprayed; and

29

      b.     when inhaled, ingested, or absorbed into the bodies of persons who used them, were nearby while they were being used, or entered fields or orchards where they had been sprayed or areas near where they had been sprayed, paraquat was likely to cause or contribute to cause latent, cumulative, and permanent neurological damage, and repeated exposures were likely to cause or contribute to cause clinically significant neurodegenerative disease, including Parkinson's disease, to develop over time and manifest long after exposure.

106.    At all relevant times, Defendants' paraquat products were in a defective condition that made them unreasonably dangerous when used in a manner that was intended or directed by or reasonably foreseeable to, and was known to or foreseen by, Defendant and those with whom it was acting in concert, in that:

      a.     they were not accompanied by directions for use that would have made paraquat unlikely to be inhaled, ingested, and absorbed into the bodies of persons who used them, were nearby while they were being used, or entered fields or orchards where they had been sprayed or areas near where they had been sprayed; and

      b.     they were not accompanied by a warning that when inhaled, ingested, or absorbed into the bodies of persons who used them, were nearby while they were being used, or entered fields or orchards where they had been sprayed or areas near where they had been sprayed, paraquat was likely to cause or contribute to cause latent, cumulative, and permanent neurological damage, and that repeated exposures were likely to cause or contribute to cause clinically significant neurodegenerative disease, including Parkinson's disease, to develop over time and manifest long after exposure.

107.    At all relevant times, this defective condition in Defendants' paraquat products existed when they left the control of Defendant and those with whom it was acting in concert and were placed into the stream of commerce.

108.    At all relevant times, Defendant and those with whom it was acting in concert knew this defective condition of Defendants' paraquat products created a substantial risk of harm to persons who used them, were nearby while they were being used, or entered fields or orchards where they had been sprayed or areas near where they had been sprayed, but in conscious disregard for the safety of others, including Plaintiff, continued to place them into the stream of commerce.

109.    As a result of this defective condition, Defendants' paraquat products either failed to perform in the manner reasonably to be expected in light of their nature and intended function, or the magnitude of the dangers outweighed their utility.

110.    At all relevant times, Defendants' paraquat products were used in a manner that was intended or directed by or reasonably foreseeable to, and was known to or foreseen by, Defendant and those with whom it was acting in concert.

**C.    Negligence**

111.    At all relevant times, Defendant and those with whom it was acting in concert were engaged in the U.S. paraquat business.

112.    At all relevant times, Defendant and those with whom it was acting in concert intended and expected that Defendants' paraquat products would be sold and used in the State of Illinois.

113.    Defendant and those with whom it was acting in concert developed, registered, manufactured, distributed, and sold paraquat for use in formulating

Defendants' paraquat products, and developed, registered, formulated and distributed Defendants' paraquat products for sale and use in the U.S., including Illinois.

114.    For many years, Plaintiff used Defendants' paraquat products in Illinois repeatedly and regularly for hours at a time, resulting in the repeated, regular, and prolonged exposure of Plaintiff to paraquat.

115.    At all relevant times, in designing, manufacturing, and distributing paraquat for use in formulating paraquat products and in designing, formulating, packaging, labeling, and distributing paraquat products, Defendant and those with whom it was acting in concert owed a duty to exercise ordinary care for the health and safety of persons, including Plaintiff, whom it was reasonably foreseeable could be exposed to paraquat in such products.

116.    When Defendant and those with whom it was acting in concert designed, manufactured, and distributed paraquat for use in formulating Defendants' paraquat products and designed, formulated, packaged, labeled, and distributed Defendants' paraquat products, it was reasonably foreseeable and in the exercise of ordinary care Defendant should have known, and Defendant did know, that when Defendants' paraquat products were used in a manner that was intended or directed by or reasonably foreseeable to, and was known to or foreseen by, Defendant and those with whom it was acting in concert:

        a.      they were designed, manufactured, formulated, and packaged such that paraquat was likely to be inhaled, ingested, and absorbed into the bodies of

32

persons who used them, were nearby while they were being used, or entered fields or orchards where they had been sprayed or areas near where they had been sprayed; and

  b. when inhaled, ingested, or absorbed into the bodies of persons who used them, were nearby while they were being used, or entered fields or orchards where they had been sprayed or areas near where they had been sprayed, paraquat was likely to cause or contribute to cause latent, cumulative, and permanent neurological damage, and repeated exposures were likely to cause or contribute to cause clinically significant neurodegenerative disease, including Parkinson's disease, to develop over time and manifest long after exposure.

  117. In breach of their duty to Plaintiff, Defendant and those with whom it was acting in concert negligently, and in conscious disregard for the safety of others:

  a. failed to design, manufacture, formulate, and package Defendants' paraquat products to make paraquat unlikely to be inhaled, ingested, and absorbed into the bodies of persons who used them, were nearby while they were being used, or entered fields or orchards where they had been sprayed or areas near where they had been sprayed;

  b. designed and manufactured paraquat and designed and formulated Defendants' paraquat products such that when inhaled, ingested, or absorbed into the bodies of persons who used Defendants' paraquat products, were nearby while they were being used, or entered fields or orchards where they had been sprayed or areas near where they had been sprayed, paraquat was likely to cause or contribute to cause latent, cumulative, and permanent neurological damage, and repeated exposures were likely to cause or contribute to cause clinically significant neurodegenerative disease, including Parkinson's disease, to develop over time and manifest long after exposure;

  c. failed to perform adequate testing to determine the extent to which exposure to paraquat was likely to occur through inhalation, ingestion, and absorption into the bodies of persons who used Defendants' paraquat products, were nearby while they were being used, or entered fields or orchards where they had been sprayed or areas near where they had been sprayed;

  d. failed to perform adequate testing to determine the extent to which spray drift from Defendants' paraquat products was likely to occur, including

their propensity to drift, the distance they were likely to drift, and the extent to which paraquat spray droplets were likely to enter the bodies of persons spraying Defendants' paraquat products or nearby during or after spraying;

e.        failed to perform adequate testing to determine the extent to which paraquat, when inhaled, ingested, or absorbed into the bodies of persons who used Defendants' paraquat products, were nearby while they were being used, or entered fields or orchards where they had been sprayed or areas near where they had been sprayed, was likely to cause or contribute to cause latent, cumulative, and permanent neurological damage, and the extent to which repeated exposures were likely to cause or contribute to cause clinically significant neurodegenerative disease, including Parkinson's disease, to develop over time and manifest long after exposure;

f.        failed to perform adequate testing to determine the extent to which paraquat, when formulated or mixed with surfactants or other pesticides or used along with other pesticides, and inhaled, ingested, or absorbed into the bodies of persons who used Defendants' paraquat products, were nearby while they were being used, or entered fields or orchards where they had been sprayed or areas near where they had been sprayed, was likely to cause or contribute to cause latent, cumulative, and permanent neurological damage, and the extent to which repeated exposures were likely to cause or contribute to cause clinically significant neurodegenerative disease, including Parkinson's disease, to develop over time and manifest long after exposure;

g.        failed to direct that Defendants' paraquat products be used in a manner that would have made it unlikely for paraquat to have been inhaled, ingested, and absorbed into the bodies of persons who used them, were nearby while they were being used, or entered fields or orchards where they had been sprayed or areas near where they had been sprayed; and

h.        failed to warn that when inhaled, ingested, or absorbed into the bodies of persons who used Defendants' paraquat products, were nearby while they were being used, or entered fields or orchards where they had been sprayed or areas near where they had been sprayed, paraquat was likely to cause or contribute to cause latent, cumulative, and permanent neurological damage, and repeated exposures were likely to cause or contribute to cause clinically significant neurodegenerative disease, including Parkinson's disease, to develop over time and manifest long after exposure.

118.    At all relevant times, Defendants' paraquat products were used in a manner that was intended or directed by or reasonably foreseeable to, and was known to or foreseen by, Defendant and those with whom it was acting in concert.

**D.    Public nuisance**

119.    At all relevant times, Defendant and those with whom it was acting in concert were engaged in the U.S. paraquat business.

120.    At all relevant times, Defendant and those with whom it was acting in concert intended and expected that Defendants' paraquat products would be sold and used in the State of Illinois.

121.    Defendant and those with whom it was acting in concert developed, registered, manufactured, distributed, and sold paraquat for use in formulating Defendants' paraquat products, and developed, registered, formulated and distributed Defendants' paraquat products for sale and use in the U.S., including Illinois.

122.    For many years, Plaintiff used Defendants' paraquat products in Illinois repeatedly and regularly for hours at a time, resulting in the repeated, regular, and prolonged exposure of Plaintiff to paraquat.

123.    Article XI of the Illinois Constitution of 1970, Environment, Section 1, Public Policy - Legislative Responsibility, provides that:

> The public policy of the State and the duty of each person is to provide and maintain a healthful environment for the benefit of this and future generations. The General Assembly shall provide by law for the implementation and enforcement of this public policy.

124. Article XI of the Illinois Constitution of 1970, Environment, Section 2, Rights of Individuals, provides that:

> Each person has the right to a healthful environment. Each person may enforce this right against any party, governmental or private, through appropriate legal proceedings subject to reasonable limitation and regulation as the General Assembly may provide by law.

125. At all relevant times, Plaintiff had the right to a healthful environment while living and working in the State of Illinois.

126. At all relevant times, Defendant and those with whom it was acting in concert owed a duty to the public, including Plaintiff and other persons whom they could reasonably foresee were likely to use Defendants' paraquat products or otherwise be in or near places where they were being or recently had been used within the State of Illinois, to provide and maintain a healthful environment in connection with the design, manufacture, and distribution of paraquat for use in formulating Defendants' paraquat products, and the design, formulation and distribution of Defendants' paraquat products, that Defendants intended and expected to be used in the State of Illinois.

127. When Defendant and those with whom it was acting in concert designed, manufactured, and distributed paraquat for use in formulating Defendants' paraquat products and designed, formulated, packaged, labeled, and distributed Defendants' paraquat products, it was reasonably foreseeable and in the exercise of ordinary care Defendant should have known, and Defendant did know, that when Defendants' paraquat products were used in a manner that was intended or directed by or

reasonably foreseeable to, and was known to or foreseen by, Defendant and those with whom it was acting in concert:

     a.    they were designed, manufactured, formulated, and packaged such that paraquat was likely to be inhaled, ingested, and absorbed into the bodies of persons who used them, were nearby while they were being used, or entered fields or orchards where they had been sprayed or areas near where they had been sprayed; and

     b.    when inhaled, ingested, or absorbed into the bodies of persons who used them, were nearby while they were being used, or entered fields or orchards where they had been sprayed or areas near where they had been sprayed, paraquat was likely to cause or contribute to cause latent, cumulative, and permanent neurological damage, and repeated exposures were likely to cause or contribute to cause clinically significant neurodegenerative disease, including Parkinson's disease, to develop over time and manifest long after exposure.

    128.    In breach of their duty to members of the public, including Plaintiff, Defendant and those with whom it was acting in concert negligently, and in conscious disregard for the safety of others:

     a.    failed to design, manufacture, formulate, and package Defendants' paraquat products to make paraquat unlikely to be inhaled, ingested, and absorbed into the bodies of persons who used them, were nearby while they were being used, or entered fields or orchards where they had been sprayed or areas near where they had been sprayed;

     b.    designed and manufactured paraquat and designed and formulated Defendants' paraquat products such that when inhaled, ingested, or absorbed into the bodies of persons who used Defendants' paraquat products, were nearby while they were being used, or entered fields or orchards where they had been sprayed or areas near where they had been sprayed, paraquat was likely to cause or contribute to cause latent, cumulative, and permanent neurological damage, and repeated exposures were likely to cause or contribute to cause clinically significant neurodegenerative disease, including Parkinson's disease, to develop over time and manifest long after exposure;

37

      c.     failed to perform adequate testing to determine the extent to which exposure to paraquat was likely to occur through inhalation, ingestion, and absorption into the bodies of persons who used Defendants' paraquat products, were nearby while they were being used, or entered fields or orchards where they had been sprayed or areas near where they had been sprayed;

      d.     failed to perform adequate testing to determine the extent to which spray drift from Defendants' paraquat products was likely to occur, including their propensity to drift, the distance they were likely to drift, and the extent to which paraquat spray droplets were likely to enter the bodies of persons spraying Defendants' paraquat products or nearby during or after spraying;

      e.     failed to perform adequate testing to determine the extent to which paraquat, when inhaled, ingested, or absorbed into the bodies of persons who used Defendants' paraquat products, were nearby while they were being used, or entered fields or orchards where they had been sprayed or areas near where they had been sprayed, was likely to cause or contribute to cause latent, cumulative, and permanent neurological damage, and the extent to which repeated exposures were likely to cause or contribute to cause clinically significant neurodegenerative disease, including Parkinson's disease, to develop over time and manifest long after exposure;

      f.     failed to perform adequate testing to determine the extent to which paraquat, when formulated or mixed with surfactants or other pesticides or used along with other pesticides, and inhaled, ingested, or absorbed into the bodies of persons who used Defendants' paraquat products, were nearby while they were being used, or entered fields or orchards where they had been sprayed or areas near where they had been sprayed, was likely to cause or contribute to cause latent, cumulative, and permanent neurological damage, and the extent to which repeated exposures were likely to cause or contribute to cause clinically significant neurodegenerative disease, including Parkinson's disease, to develop over time and manifest long after exposure;

      g.     failed to direct that Defendants' paraquat products be used in a manner that would have made it unlikely for paraquat to have been inhaled, ingested, and absorbed into the bodies of persons who used them, were nearby while they were being used, or entered fields or orchards where they had been sprayed or areas near where they had been sprayed; and

      h.     failed to warn that when inhaled, ingested, or absorbed into the bodies of persons who used Defendants' paraquat products, were nearby while

they were being used, or entered fields or orchards where they had been sprayed or areas near where they had been sprayed, paraquat was likely to cause or contribute to cause latent, cumulative, and permanent neurological damage, and repeated exposures were likely to cause or contribute to cause clinically significant neurodegenerative disease, including Parkinson's disease, to develop over time and manifest long after exposure.

129. At all relevant times, Defendants' paraquat products were used in a manner that was intended or directed by or reasonably foreseeable to, and was known to and foreseen by, Defendant and those with whom it was acting in concert.

**E.    Illinois Consumer Fraud and Deceptive Business Practices Act, 815 ILCS 505/1, *et seq.***

130. At all relevant times, Defendant and those with whom it was acting in concert were engaged in the U.S. paraquat business.

131. At all relevant times, Defendant and those with whom it was acting in concert intended and expected that Defendants' paraquat products would be sold and used in the State of Illinois.

132. Defendant and those with whom it was acting in concert developed, registered, manufactured, distributed, and sold paraquat for use in formulating Defendants' paraquat products, and developed, registered, formulated and distributed Defendants' paraquat products for sale and use in the U.S., including Illinois.

133. Plaintiff, a member of Plaintiff's family, or Plaintiff's employer purchased Defendants' paraquat products in Illinois for the purpose of controlling weeds and not for resale, and for many years, Plaintiff used these products in Illinois repeatedly and

regularly for hours at a time, resulting in the repeated, regular, and prolonged exposure of Plaintiff to paraquat.

134.     At all relevant times, Plaintiff, Defendant, and others with whom Defendant acted in concert, were persons within the meaning of 815 ILCS 505/1(c).

135.     At all relevant times, Plaintiff was a consumer within the meaning of 815 ILCS 505/1(e).

136.     At all relevant times, Defendant and those with whom it was acting in concert were engaged in the conduct of trade and commerce within the meaning of 815 ILCS 505/1(f).

137.     The Illinois Consumer Fraud and Deceptive Business Practices Act, 815 ILCS 505/1 et seq., provides in pertinent part:

> Unfair methods of competition and unfair or deceptive acts or practices, including but not limited to the use or employment of any deception, fraud, false pretense, false promise, misrepresentation or the concealment, suppression, or omission of any material fact, with intent that others rely upon the concealment, suppression or omission of such material fact, or the use or employment of any practices described in Section 2 of the 'Uniform Deceptive Trade Practices Act', approved August 6, 1965, in conduct of any trade or commerce are hereby declared unlawful, whether any person has in fact been misled, deceived, or damaged thereby.

138.     At all relevant times, Defendant and those with whom it was acting in concert had both constructive and actual knowledge that when Defendants' paraquat products were used in a manner that was intended or directed by or reasonably

   Case 3:21-cv-00290-NJR Document 1 Filed 02/26/21 Page 44 of 64 Page ID #41

foreseeable to, and was known to or foreseen by, Defendant and those with whom it

was acting in concert:

      a.     they were designed, manufactured, formulated, and packaged such that paraquat was likely to be inhaled, ingested, and absorbed into the bodies of persons who used them, were nearby while they were being used, or entered fields or orchards where they had been sprayed or areas near where they had been sprayed; and

      b.     when inhaled, ingested, or absorbed into the bodies of persons who used them, were nearby while they were being used, or entered fields or orchards where they had been sprayed or areas near where they had been sprayed, paraquat was likely to cause or contribute to cause latent, cumulative, and permanent neurological damage, and repeated exposures were likely to cause or contribute to cause clinically significant neurodegenerative disease, including Parkinson's disease, to develop over time and manifest long after exposure.

      139.    At all relevant times, Defendant and those with whom it was acting in

concert had both constructive and actual knowledge that:

      a.     adequate testing had not been performed to determine the extent to which exposure to paraquat was likely to occur through inhalation, ingestion, and absorption into the bodies of persons who used Defendants' paraquat products, were nearby while they were being used, or entered fields or orchards where they had been sprayed or areas near where there had been sprayed;

      b.     adequate testing had not been performed to determine the extent to which spray drift was likely to occur when Defendants' paraquat products were used, including their propensity to drift, the distance they were likely to drift, and the extent to which paraquat spray droplets were likely to enter the bodies of persons spraying or others nearby during or after spraying;

      c.     adequate testing had not been performed to determine the extent to which paraquat, when inhaled, ingested, or absorbed into the bodies of persons who used Defendants' paraquat products, were nearby while they were being used, or entered fields or orchards where they had been sprayed or areas near where they had been sprayed, were likely to cause or contribute to cause latent, cumulative, and permanent neurological damage, and the extent to which

repeated exposures were likely to cause or contribute to cause clinically significant neurodegenerative disease, including Parkinson's disease, to develop over time and manifest long after exposure; and

     d.    adequate testing had not been performed to determine the extent to which paraquat, when formulated or mixed with surfactants or other pesticides or used along with other pesticides, and inhaled, ingested, or absorbed into the bodies of persons who used Defendants' paraquat products, were nearby while they were being used, or entered fields or orchards where they had been sprayed or areas near where there had been sprayed, was likely to cause or contribute to cause latent, cumulative, and permanent neurological damage, and the extent to which repeated exposures were likely to cause or contribute to cause clinically significant neurodegenerative disease, including Parkinson's disease, to develop over time and manifest long after exposure.

140.    From the first date on which Defendant and those with whom it was acting in concert placed Defendants' paraquat products into the stream of commerce for use in the State of Illinois through the last date on which Plaintiff was exposed to Defendants' paraquat products, Defendant and those with whom it was acting in concert engaged in unfair or deceptive acts or practices, including but not limited to deception, fraud, false pretense, false promise, misrepresentation or the concealment, suppression, or omission of material facts, in designing, manufacturing, and distributing paraquat for use in formulating Defendants' paraquat products for distribution for sale and use in the State of Illinois and in designing, formulating, and distributing Defendants' paraquat products for sale and use in the State of Illinois, in that they:

     a.    concealed, suppressed, or omitted to disclose that Defendants' paraquat products were designed, manufactured, formulated, and packaged such that paraquat was likely to be inhaled, ingested, and absorbed into the

bodies of persons who used them, were nearby while they were being used, or entered fields or orchards where they had been sprayed or areas near where they had been sprayed;

b.  concealed, suppressed, or omitted to disclose that when inhaled, ingested, or absorbed into the bodies of persons who used Defendants' paraquat products, were nearby while they were was being used, or entered fields or orchards where they had been sprayed or areas near where they had been sprayed, paraquat was likely to cause or contribute to cause latent, cumulative, and permanent neurological damage, and repeated exposures were likely to cause or contribute to cause clinically significant neurodegenerative disease, including Parkinson's disease, to develop over time and manifest long after exposure;

c.  concealed, suppressed, or omitted to disclose that adequate testing had not been performed to determine the extent to which exposure to paraquat was likely to occur through inhalation, ingestion, and absorption into the bodies of persons who used Defendants' paraquat products, were nearby while they were being used, or entered fields or orchards where they had been sprayed or areas near where they had been sprayed;

d.  concealed, suppressed, or omitted to disclose that adequate testing had not been performed to determine the extent to which spray drift was likely to occur when Defendants' paraquat products were used, including their propensity to drift, the distance they were likely to drift, and the extent to which paraquat spray droplets were likely to enter the bodies of persons spraying or others nearby during or after spraying;

e.  concealed, suppressed, or omitted to disclose that adequate testing had not been performed to determine the extent to which paraquat, when inhaled, ingested, or absorbed into the bodies of persons who used Defendants' paraquat products, were nearby while they were being used, or entered fields or orchards where they had been sprayed or areas near where they had been sprayed, was likely to cause or contribute to cause latent, cumulative, and permanent neurological damage, and the extent to which repeated exposures were likely to cause or contribute to cause clinically significant neurodegenerative disease, including Parkinson's disease, to develop over time and manifest long after exposure; and

f.  concealed, suppressed, or omitted to disclose that adequate testing had not been performed to determine the extent to which paraquat, when

formulated or mixed with surfactants or other pesticides or used along with other pesticides, and inhaled, ingested, or absorbed into the bodies of persons who used Defendants' paraquat products, were nearby while they were being used, or entered fields or orchards where they had been sprayed or areas near where they had been sprayed, was likely to cause or contribute to cause latent, cumulative, and permanent neurological damage, and the extent to which repeated exposures were likely to cause or contribute to cause clinically significant neurodegenerative disease, including Parkinson's disease, to develop over time and manifest long after exposure.

141.    These acts and practices of Defendant and those with whom it was acting in concert in designing, manufacturing, and distributing paraquat for use in formulating Defendants' paraquat products for distribution for sale and use in the State of Illinois and in designing, formulating, and distributing Defendants' paraquat products for sale and use in the State of Illinois were unfair because they offended public policy, were immoral, unethical, oppressive, and unscrupulous, and caused substantial injury to consumers.

142.    These acts and practices of Defendant and those with whom it was acting in concert in designing, manufacturing, and distributing paraquat for use in formulating Defendants' paraquat products for distribution for sale and use in the State of Illinois and in designing, formulating, and distributing Defendants' paraquat products for sale and use in the State of Illinois offended the clearly stated public policy of the State of Illinois, as expressed in Article XI of the Illinois Constitution of 1970, Environment, Section 1, Public Policy - Legislative Responsibility, that:

The public policy of the State and the duty of each person is to provide and maintain a healthful environment for the benefit of this and future generations.

The General Assembly shall provide by law for the implementation and enforcement of this public policy.

143.    These acts and practices of Defendant and those with whom it was acting in concert in designing, manufacturing, and distributing paraquat for use in formulating Defendants' paraquat products for distribution for sale and use in the State of Illinois and in designing, formulating, and distributing Defendants' paraquat products for sale and use in the State of Illinois offended the clearly stated public policy of the State of Illinois, as expressed in Article XI of the Illinois Constitution of 1970, Environment, Section 2, Rights of Individuals, that:

Each person has the right to a healthful environment. Each person may enforce this right against any party, governmental or private, through appropriate legal proceedings subject to reasonable limitation and regulation as the General Assembly may provide by law.

144.    These acts and practices of Defendant and those with whom it was acting in concert in designing, manufacturing, and distributing paraquat for use in formulating Defendants' paraquat products for distribution for sale and use in the State of Illinois and in designing, formulating, and distributing Defendants' paraquat products for sale and use in the State of Illinois were immoral and unethical, as they served only to benefit Defendant and those with whom it was acting in concert at the expense of the heath of purchasers and users of Defendants' paraquat products and the public.

45

145.    These acts and practices of Defendant and those with whom it was acting in concert in designing, manufacturing, and distributing paraquat for use in formulating Defendants' paraquat products for distribution for sale and use in the State of Illinois and in designing, formulating, and distributing Defendants' paraquat products for sale and use in the State of Illinois were likely to cause substantial injury to purchasers and users of paraquat and the public by exposing them to unnecessary risks to their health.

146.    These acts and practices of Defendant and those with whom it was acting in concert in designing, manufacturing, and distributing paraquat for use in formulating Defendants' paraquat products for distribution for sale and use in the State of Illinois and in designing, formulating, and distributing Defendants' paraquat products for sale and use in the State of Illinois were likely to cause, and did cause, substantial injury to purchasers and users of paraquat and the public in that but for these acts and practices, Defendants' paraquat products would not have been purchased for use in Illinois and persons who used them, were nearby while they was being used, or entered fields or orchards where they had been sprayed or areas near where it they been sprayed, would not have been injured by exposure to paraquat.

147.    Defendant and those with whom it was acting in concert in designing, manufacturing, and distributing paraquat for use in formulating Defendants' paraquat products for distribution for sale and use in the State of Illinois and in designing,

formulating, and distributing Defendants' paraquat products for sale and use in the State of Illinois committed these acts and engaged in these practices in conscious disregard of the safety of others, including Plaintiff.

148.    The injuries caused by these acts and practices of Defendant and those with whom it was acting in concert in designing, manufacturing, and distributing paraquat for use in formulating Defendants' paraquat products for distribution for sale and use in the State of Illinois and in designing, formulating, and distributing Defendants' paraquat products for sale and use in the State of Illinois—namely, purchasers' monetary losses and the injuries and damages (including monetary losses) to persons who used them, were nearby while they were being used, or entered fields or orchards where they had been sprayed or areas near where they had been sprayed, including Plaintiff—are not outweighed by any countervailing benefit to consumers or competition.

149.    The injuries caused by these acts and practices of Defendant and those with whom it was acting in concert in designing, manufacturing, and distributing paraquat for use in formulating Defendants' paraquat products for distribution for sale and use in the State of Illinois and in designing, formulating, and distributing Defendants' paraquat products for sale and use in the State of Illinois—namely, purchasers' monetary losses and the injuries and damages (including monetary losses) to persons who used them, were nearby while they were being used, or entered fields

or orchards where they had been sprayed or areas near where they had been sprayed, including Plaintiff—were not reasonably avoidable; because Defendant and those with whom it was acting in concert had and failed to disclose material non-public information, consumers had no reason to anticipate the impending harm and thus avoid their injuries.

150.    Defendant and those with whom it was acting in concert intended that purchasers of Defendants' paraquat products, including Plaintiff, purchase them in reliance on these unfair and deceptive acts and practices.

151.    The facts that Defendant and those with whom it was acting in concert concealed, suppressed, or omitted to disclose were material to the decisions to purchase Defendants' paraquat products, and would not have been purchased had these facts been disclosed.

152.    These unfair and deceptive acts and practices of Defendant and those with whom it was acting in concert occurred in connection with their conduct of trade and commerce in the State of Illinois.

153.    These unfair and deceptive acts and practices of Defendant and those with whom it was acting in concert violated the Illinois Consumer Fraud and Deceptive Business Practices Act, 815 ILCS §505/2, and the Uniform Deceptive Trade Practices Act, 815 ILCS §510/2.

154.    Defendant and those with whom it was acting in concert committed these unfair and deceptive practices knowing they created a substantial risk of harm to Plaintiff and others who purchased and used Defendants' paraquat products in Illinois.

F.    **Breach of implied warranty of merchantability**

155.    At all relevant times, Defendant and those with whom it was acting in concert were engaged in the U.S. paraquat business.

156.    At all relevant times, Defendant and those with whom it was acting in concert intended and expected that Defendants' paraquat products would be sold and used in the State of Illinois.

157.    Defendant and those with whom it was acting in concert developed, registered, manufactured, distributed, and sold paraquat for use in formulating Defendants' paraquat products, and developed, registered, formulated and distributed Defendants' paraquat products for sale and use in the U.S., including Illinois.

158.    Plaintiff used Defendants' paraquat products in Illinois repeatedly and regularly for hours at a time, resulting in the repeated, regular, and prolonged exposure of Plaintiff to paraquat.

159.    At the time of each sale of Defendants' paraquat products that resulted in Plaintiff's exposure to paraquat, Defendant and those with whom it was acting in concert impliedly warranted that Defendants' paraquat products were of merchantable quality, including that they were fit for the ordinary purposes for which such goods

were used, pursuant to section 2-314 of the Uniform Commercial Code, 810 ILCS 5/2-314.

160. Defendant and those with whom it was acting in concert breached this warranty as to each sale of Defendants' paraquat products that resulted in Plaintiff's exposure to paraquat, in that Defendants' paraquat products were not of merchantable quality because they were not fit for the ordinary purposes for which such goods were used, and in particular:

     a. they were designed, manufactured, formulated, and packaged such that paraquat was likely to be inhaled, ingested, and absorbed into the bodies of persons who used them, were nearby while they were being used, or entered fields or orchards where they had been sprayed or areas near where they had been sprayed; and

     b. when inhaled, ingested, or absorbed into the bodies of persons who used Defendants' paraquat products, were nearby while they were being used, or entered fields or orchards where they had been sprayed or areas near where they had been sprayed, paraquat was likely to cause or contribute to cause latent, cumulative, and permanent neurological damage, and repeated exposures were likely to cause or contribute to cause clinically significant neurodegenerative disease, including Parkinson's disease, to develop over time and manifest long after exposure.

## VIII. Plaintiff's individual allegations and causes of action

161. Plaintiff TERRY RUNYON was born in 1953 and, from about 1972-2018, he has worked on his family's farm in Richland County, where corn, soybeans, and wheat were grown.

50

162.    While working on his family's farm from about 1972-2018, Plaintiff TERRY RUNYON was regularly in or near fields where Defendants' paraquat products were being or had been sprayed.

163.    From 1985 until at least 1995 (and periodically thereafter), Plaintiff TERRY RUNYON regularly mixed, loaded, and cleaned up Defendants' paraquat products, and applied Defendants' paraquat products on the farm's crop fields using hand-held sprayers or an open tractor with a boom sprayer.

164.    Plaintiff TERRY RUNYON was repeatedly exposed to and inhaled, ingested, and absorbed paraquat while he was mixing, loading, spraying, and cleaning up Defendants' paraquat products, while he was clearing clogged spraying equipment, and while he was in or near fields where Defendants' paraquat products were being or had been sprayed.

165.    Each exposure of Plaintiff TERRY RUNYON to paraquat from Defendants' paraquat products caused or contributed to cause Plaintiff TERRY RUNYON to develop Parkinson's disease, with which he was diagnosed in 2018 when he was 65 years of age, by initiating a decades-long process in which oxidation and oxidative stress, created or aggravated by the ongoing redox cycling of paraquat, damaged and interfered with essential functions of dopaminergic neurons in his SNpc, resulting in the ongoing degeneration and death, as time passed, of progressively more dopaminergic neurons.

166.    Less than two years from the date of this filing, Plaintiff TERRY RUNYON learned that paraquat caused or contributed to cause his Parkinson's disease.

167.    Plaintiff TERRY RUNYON was exposed to paraquat in Defendants' paraquat products purchased by himself or a family member from local agricultural businesses, such as Wabash Valley Farm Supply, Ritters Farm Supply, and others.

168.    Defendant and those with whom it was acting in concert manufactured and distributed the paraquat that was used in formulating Defendants' paraquat products and to which Plaintiff TERRY RUNYON was exposed, and formulated and distributed Defendants' paraquat products that contained the paraquat to which Plaintiff TERRY RUNYON was exposed, intending or expecting that these products would be sold and used in the State of Illinois.

169.    When Plaintiff TERRY RUNYON was exposed to paraquat, he neither knew nor could have expected that paraquat was neurotoxic or that exposure to it could cause any neurological injury or neurodegenerative disease.

170.    When Plaintiff TERRY RUNYON was exposed to paraquat, he neither knew nor could have expected that wearing gloves, a mask, or other personal protective equipment or taking any other precautions might have prevented or reduced the risk of a neurological injury or neurodegenerative disease caused by exposure to paraquat.

## COUNT 1
### PLAINTIFF TERRY RUNYON
### DEFENDANTS SCPLLC AND SAG
### STRICT PRODUCT LIABILITY – DESIGN DEFECT
### PERSONAL INJURIES

171.    Plaintiff TERRY RUNYON incorporates in this Count by reference paragraphs 1–91, 92–100, and 161–170 of this Complaint.

172.    As a direct and proximate result of the defective and unreasonably dangerous condition of Defendants' paraquat products, Plaintiff TERRY RUNYON developed Parkinson's disease; has suffered severe and permanent physical pain, mental anguish, and disability, and will continue to do so for the remainder of his life; has suffered the loss of a normal life and will continue to do so for the remainder of his life; has lost income that he otherwise would have earned and will continue to do so for the remainder of his life; and has incurred reasonable expenses for necessary medical treatment and will continue to do so for the remainder of his life.

## COUNT 2
### PLAINTIFF TERRY RUNYON
### DEFENDANTS SCPLLC AND SAG
### STRICT PRODUCT LIABILITY – FAILURE TO WARN
### PERSONAL INJURIES

173.    Plaintiff TERRY RUNYON incorporates in this Count by reference paragraphs 1–91, 101–110, and 161–170 of this Complaint.

174.    As a direct and proximate result of the lack of adequate directions for the use of and warnings about the dangers of Defendants' paraquat products, Plaintiff

TERRY RUNYON developed Parkinson's disease; has suffered severe and permanent physical pain, mental anguish, and disability, and will continue to do so for the remainder of his life; has suffered the loss of a normal life and will continue to do so for the remainder of his life; has lost income that he otherwise would have earned and will continue to do so for the remainder of his life; and has incurred reasonable expenses for necessary medical treatment and will continue to do so for the remainder of his life.

**COUNT 3**
**PLAINTIFF TERRY RUNYON**
**DEFENDANTS SCPLLC AND SAG**
**NEGLIGENCE**
**PERSONAL INJURIES**

175.    Plaintiff TERRY RUNYON incorporates in this Count by reference paragraphs 1–91, 111–118, and 161–170 of this Complaint.

176.    As a direct and proximate result of the negligence of Defendant and those with whom it was acting in concert, Plaintiff TERRY RUNYON developed Parkinson's disease; has suffered severe and permanent physical pain, mental anguish, and disability, and will continue to do so for the remainder of his life; has suffered the loss of a normal life and will continue to do so for the remainder of his life; has lost income that he otherwise would have earned and will continue to do so for the remainder of his life; and has incurred reasonable expenses for necessary medical treatment and will continue to do so for the remainder of his life.

## COUNT 4
### PLAINTIFF TERRY RUNYON
### DEFENDANTS SCPLLC AND SAG
### PUBLIC NUISANCE
### PERSONAL INJURIES

177.    Plaintiff TERRY RUNYON incorporates in this Count by reference

paragraphs 1–91, 119–129, and 161–170 of this Complaint.

178.    As a direct and proximate result of the public nuisance created by

Defendant and those with whom it was acting in concert, Plaintiff TERRY RUNYON

developed Parkinson's disease; has suffered severe and permanent physical pain,

mental anguish, and disability, and will continue to do so for the remainder of his life;

has suffered the loss of a normal life and will continue to do so for the remainder of his

life; has lost income that he otherwise would have earned and will continue to do so for

the remainder of his life; and has incurred reasonable expenses for necessary medical

treatment and will continue to do so for the remainder of his life.

## COUNT 5
### PLAINTIFF TERRY RUNYON
### DEFENDANTS SCPLLC AND SAG
### CONSUMER FRAUD AND DECEPTIVE BUSINESS PRACTICES ACT
### PERSONAL INJURIES

179.    Plaintiff TERRY RUNYON incorporates in this Count by reference

paragraphs 1–91, 130–154, and 161–170 of this Complaint.

180.    As a direct and proximate result of the violations of the Consumer Fraud

and Deceptive Business Practices Act by Defendant and those with whom it was acting

in concert, Plaintiff TERRY RUNYON developed Parkinson's disease; has suffered severe and permanent physical pain, mental anguish, and disability, and will continue to do so for the remainder of his life; has suffered the loss of a normal life and will continue to do so for the remainder of his life; has lost income that he otherwise would have earned and will continue to do so for the remainder of his life; and has incurred reasonable expenses for necessary medical treatment and will continue to do so for the remainder of his life.

**COUNT 6**
**PLAINTIFF TERRY RUNYON**
**DEFENDANTS SCPLLC AND SAG**
**BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY**
**PERSONAL INJURIES**

181.    Plaintiff TERRY RUNYON incorporates in this Count by reference paragraphs 1–91, 155–160, and 161–170 of this Complaint.

182.    As a direct and proximate result of the breaches of the implied warranty of merchantability by Defendant and those with whom it was acting in concert, Plaintiff TERRY RUNYON developed Parkinson's disease; has suffered severe and permanent physical pain, mental anguish, and disability, and will continue to do so for the remainder of his life; has suffered the loss of a normal life and will continue to do so for the remainder of his life; has lost income that he otherwise would have earned and will continue to do so for the remainder of his life; and has incurred reasonable expenses for necessary medical treatment and will continue to do so for the remainder of his life.

## COUNT 7
### PLAINTIFF TERRY RUNYON
### DEFENDANT CHEVRON U.S.A., INC.
### STRICT PRODUCT LIABILITY – DESIGN DEFECT
### PERSONAL INJURIES

183.    Plaintiff TERRY RUNYON incorporates in this Count by reference

paragraphs 1–91, 92–100, and 161–170 of this Complaint.

184.    As a direct and proximate result of the defective and unreasonably

dangerous condition of Defendants' paraquat products, Plaintiff TERRY RUNYON

developed Parkinson's disease; has suffered severe and permanent physical pain,

mental anguish, and disability, and will continue to do so for the remainder of his life;

has suffered the loss of a normal life and will continue to do so for the remainder of his

life; has lost income that he otherwise would have earned and will continue to do so for

the remainder of his life; and has incurred reasonable expenses for necessary medical

treatment and will continue to do so for the remainder of his life.

## COUNT 8
### PLAINTIFF TERRY RUNYON
### DEFENDANT CHEVRON U.S.A., INC.
### STRICT PRODUCT LIABILITY – FAILURE TO WARN
### PERSONAL INJURIES

185.    Plaintiff TERRY RUNYON incorporates in this Count by reference

paragraphs 1–91, 101–110, and 161–170 of this Complaint.

186.    As a direct and proximate result of the lack of adequate directions for the

use of and warnings about the dangers of Defendants' paraquat products, Plaintiff

TERRY RUNYON developed Parkinson's disease; has suffered severe and permanent physical pain, mental anguish, and disability, and will continue to do so for the remainder of his life; has suffered the loss of a normal life and will continue to do so for the remainder of his life; has lost income that he otherwise would have earned and will continue to do so for the remainder of his life; and has incurred reasonable expenses for necessary medical treatment and will continue to do so for the remainder of his life.

**COUNT 9**
**PLAINTIFF TERRY RUNYON**
**DEFENDANT CHEVRON U.S.A., INC.**
**NEGLIGENCE**
**PERSONAL INJURIES**

187.     Plaintiff TERRY RUNYON incorporates in this Count by reference paragraphs 1–91, 111–118, and 161–170 of this Complaint.

188.     As a direct and proximate result of the negligence of Defendant and those with whom was acting in concert, Plaintiff TERRY RUNYON developed Parkinson's disease; has suffered severe and permanent physical pain, mental anguish, and disability, and will continue to do so for the remainder of his life; has suffered the loss of a normal life and will continue to do so for the remainder of his life; has lost income that he otherwise would have earned and will continue to do so for the remainder of his life; and has incurred reasonable expenses for necessary medical treatment and will continue to do so for the remainder of his life.

## COUNT 10
### PLAINTIFF TERRY RUNYON
### DEFENDANT CHEVRON U.S.A., INC.
### PUBLIC NUISANCE
### PERSONAL INJURIES

189.     Plaintiff TERRY RUNYON incorporates in this Count by reference

paragraphs 1–91, 119–129, and 161–170 of this Complaint.

190.     As a direct and proximate result of the public nuisance created by

Defendant and those with whom it was acting in concert, Plaintiff TERRY RUNYON

developed Parkinson's disease; has suffered severe and permanent physical pain,

mental anguish, and disability, and will continue to do so for the remainder of his life;

has suffered the loss of a normal life and will continue to do so for the remainder of his

life; has lost income that he otherwise would have earned and will continue to do so for

the remainder of his life; and has incurred reasonable expenses for necessary medical

treatment and will continue to do so for the remainder of his life.

## COUNT 11
### PLAINTIFF TERRY RUNYON
### DEFENDANT CHEVRON U.S.A., INC.
### CONSUMER FRAUD AND DECEPTIVE BUSINESS PRACTICES ACT
### PERSONAL INJURIES

191.     Plaintiff TERRY RUNYON incorporates in this Count by reference

paragraphs 1–91, 130–154, and 161–170 of this Complaint.

192.     As a direct and proximate result of the violations of the Consumer Fraud

and Deceptive Business Practices Act by Defendant and those with whom it was acting

in concert, Plaintiff TERRY RUNYON developed Parkinson's disease; has suffered severe and permanent physical pain, mental anguish, and disability, and will continue to do so for the remainder of his life; has suffered the loss of a normal life and will continue to do so for the remainder of his life; has lost income that he otherwise would have earned and will continue to do so for the remainder of his life; and has incurred reasonable expenses for necessary medical treatment and will continue to do so for the remainder of his life.

**COUNT 12**
**PLAINTIFF TERRY RUNYON**
**DEFENDANT CHEVRON U.S.A., INC.**
**BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY**
**PERSONAL INJURIES**

193.    Plaintiff TERRY RUNYON incorporates in this Count by reference paragraphs 1–91, 155–160, and 161–170 of this Complaint.

194.    As a direct and proximate result of the breaches of the implied warranty of merchantability by Defendant and those with whom it was acting in concert, Plaintiff TERRY RUNYON developed Parkinson's disease; has suffered severe and permanent physical pain, mental anguish, and disability, and will continue to do so for the remainder of his life; has suffered the loss of a normal life and will continue to do so for the remainder of his life; has lost income that he otherwise would have earned and will continue to do so for the remainder of his life; and has incurred reasonable expenses for necessary medical treatment and will continue to do so for the remainder of his life.

## IX.     Plaintiff's prayers for relief

195.     Plaintiff TERRY RUNYON prays that this Court enter judgment in his favor and against Defendants SYNGENTA CROP PROTECTION LLC, SYNGENTA AG, and CHEVRON U.S.A., INC., jointly and severally for compensatory damages in an amount greater than $75,000.00 plus costs of suit, severally as to each Defendant for punitive damages in an amount sufficient to punish it and encourage it and others from similar conduct, for reasonable attorney's fees, and for such further relief as is just and appropriate in the circumstances.

## X.     Demand for jury trial

196.     Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiff demands a jury trial as to all issues triable by a jury.

**KOREIN TILLERY, LLC**

Dated:  February 26, 2021          BY:  /s/ Stephen M. Tillery
                                     Stephen M. Tillery, IL ARDC #2834995
                                     John C. Craig, IL ARDC #6206733
                                     One U.S. Bank Plaza
                                     505 N. 7th Street, Suite 3600
                                     St. Louis, MO 63101
                                     Telephone: (314) 241-4844
                                     Facsimile: (314) 241-3525
                                     stillery@koreintillery.com
                                     jcraig@koreintillery.com

                                     **Attorneys for Plaintiff**