**U.S. District Court**
**Southern District of Georgia (Dublin)**
**CIVIL DOCKET FOR CASE #: 3:22-cv-00076-DHB-BKE**

Johnson et al v. Syngenta Crop Protection, LLC et al
Assigned to: Judge Dudley H. Bowen
Referred to: Magistrate Judge Brian K. Epps
Cause: 28:1332 Diversity-Personal Injury

Date Filed: 07/13/2022
Jury Demand: Plaintiff
Nature of Suit: 365 Personal Inj. Prod. Liability
Jurisdiction: Diversity

**Plaintiff**

**Michael Johnson**                                    represented by    **Archie I. Grubb , II**
                                                                          Beasley Allen Law Firm
                                                                          218 Commerce St.
                                                                          P. O. Box 4160
                                                                          Montgomery, AL 36103-4160
                                                                          334-269-2343
                                                                          Fax: 334-954-7555
                                                                          Email: Archie.Grubb@BeasleyAllen.com
                                                                          *LEAD ATTORNEY*
                                                                          *ATTORNEY TO BE NOTICED*

**Plaintiff**

**Kathy Johnson**                                      represented by    **Archie I. Grubb , II**
                                                                          (See above for address)
                                                                          *LEAD ATTORNEY*
                                                                          *ATTORNEY TO BE NOTICED*

V.

**Defendant**

**Syngenta Crop Protection, LLC**

**Defendant**

**Syngenta AG**

**Defendant**

**Chevron U.S.A., Inc.**

| # | Docket Text | Date Filed |
|---|---|---|
| 1 | COMPLAINT against Chevron U.S.A., Inc., Syngenta AG, Syngenta Crop Protection, LLC, filed by Michael Johnson, Kathy Johnson. (Attachments: # 1 Civil Cover Sheet)(maa) (Entered: 07/14/2022) | 07/13/2022 |
| 2 | Summons Submitted. (maa) (Entered: 07/14/2022) | 07/13/2022 |
|   | Filing fee: $402, receipt number AUG030939 (maa) (Entered: 07/14/2022) | 07/14/2022 |
| 3 | Summons Issued as to Chevron U.S.A., Inc. (maa) (Entered: 07/14/2022) | 07/14/2022 |
| 4 | RULE 26(f) ORDER. Signed by Magistrate Judge Brian K. Epps on 7/14/2022. (maa) (Entered: 07/14/2022) | 07/14/2022 |
| 5 | Summons Issued as to Syngenta AG, Syngenta Crop Protection, LLC. (maa) (Entered: 07/14/2022) | 07/14/2022 |

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF GEORGIA
### DUBLIN DIVISION

| | | |
|---|---|---|
| MICHAEL JOHNSON | ) | |
| & KATHY JOHNSON, | ) | |
| Plaintiffs | ) | |
| | ) | Case No. |
| v. | ) | |
| SYNGENTA CROP | ) | **DEMAND FOR JURY TRIAL** |
| PROTECTION, LLC; | ) | |
| SYNGENTA AG; and | ) | |
| CHEVRON U.S.A., INC. | ) | |
| Defendants | ) | |

## COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL

Plaintiffs Michael Johnson and Kathy Johnson (collectively hereinafter "Plaintiffs"),

by and through counsel, file this Complaint against Defendants Syngenta Crop Protection,

LLC, Syngenta AG, and Chevron U.S.A., Inc., (collectively hereinafter "Defendants"), both

jointly and severally, as the companies and/or successors-in-interest to the companies that

developed, manufactured, tested, labeled, packaged, distributed, marketed, and/or sold Paraquat

herbicide that Plaintiff Michael Johnson used. Accordingly, Plaintiffs allege and assert:

### I. SUMMARY OF THE CASE

1.  Paraquat is a synthetic chemical compound[1] that since the mid-1960s has been

    developed, registered, manufactured, distributed, sold for use, and used as an active

---

[1] Paraquat dichloride (EPA Pesticide Chemical Code 061601) or paraquat methosulfate (EPA Pesticide Chemical Code 061602).

ingredient in herbicide products ("Paraquat") developed, registered, formulated, distributed, and sold for use in the United States, including the State of Georgia.

2. Defendants are companies and successors-in-interest to companies that manufactured, distributed, and sold Paraquat for use in Georgia, sold and used Paraquat in Georgia, or owned property in Georgia where Paraquat was used.

3. Plaintiffs bring this suit against Defendants to recover damages for personal injuries and losses of support, society, and consortium resulting from Michael Johnson's exposure to Paraquat over years in Georgia.

4. Plaintiff Michael Johnson suffers from Parkinson's Disease caused by exposure to the herbicide Paraquat.

5. Plaintiff Kathy Johnson is the spouse of Michael Johnson.

6. Defendants' tortious conduct, including their negligent acts and omissions in the research, testing, design, manufacture, marketing, and sale of Paraquat, caused the Plaintiffs' injuries.

7. At all relevant times, Defendants knew, or in the exercise of reasonable care should have known, that Paraquat was a highly toxic substance that can cause severe neurological injuries and impairment, and should have taken steps in their research, manufacture, and sale of Paraquat to ensure that people would not be harmed by foreseeable uses of Paraquat.

## II. PARTIES, JURISDICTION AND VENUE

8. Plaintiffs incorporate by reference all preceding paragraphs as if fully set forth herein and further alleges as follows:

9.  This Court has jurisdiction over Defendants and this action pursuant to 28 U.S.C. § 1332 because there is complete diversity of citizenship between Plaintiff and each Defendant.

10. Plaintiffs are residents of Eastman, Dodge County, Georgia.

11. Defendant Syngenta Crop Protection, LLC ("SCPLLC"), is a Delaware LLC and is a wholly-owned subsidiary of defendant Syngent AG.

12. Defendant Syngenta AG ("SAG") is a foreign corporation with its principal place of business in Basel, Switzerland.

13. Defendant Chevron U.S.A., Inc. ("Chevron USA"), is a Pennsylvania corporation with its principal place of business in San Ramon, California.

14. At all times herein mentioned, each and every one of the Defendants was the agent, servant, employee, joint venture, alter ego, successor-in-interest, and predecessor-in-interest of each of the other, and each was acting within the course and scope of their agency, service, joint venture, alter ego relationship, employment, and corporate interrelationship.

15. The amount in controversy between Plaintiffs and Defendants exceeds $75,000.00, exclusive of interest and costs.

16. Venue is proper within the Southern District of Georgia pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred in this district, in that Plaintiffs' claims and injuries arise out of Michael Johnson's exposure to and use of Paraquat in this district, which was distributed and sold for use in this district, actually purchased or purchased for use in this district, and being used in this district when the exposures causing Plaintiffs' injuries and damages occurred.

17. Defendants conduct business in the Southern District of Georgia and are subject to personal jurisdiction in this district.

18. Furthermore, Defendants sell, market, and/or distribute Paraquat within the Southern District of Georgia.

19. The Court has personal jurisdiction over each of the Defendants in this diversity case because a state court of Georgia would have such jurisdiction, in that:

   a. Over a period of two (Chevron) to six (Syngenta) decades, each Defendant and/or its predecessor(s) in interest, together with those with whom they were acting in concert, manufactured Paraquat for use as an active ingredient in Paraquat products, distributed Paraquat to formulators of Paraquat products, formulated Paraquat products, marketed Paraquat products to the Georgia agricultural community, and/or distributed Paraquat products, intending that such products regularly would be, and knowing they regularly were, sold and used in the State of Georgia.

   b. Plaintiffs' claims against each Defendant arise out of these contacts between the Defendant and/or its predecessor(s) in interest, together with those with whom they were acting in concert, with the State of Georgia; and

   c. These contacts between each Defendant and/or its predecessors, together with those with whom they were acting in concert, and the State of Georgia, were so regular, frequent, and sustained as to provide fair warning that it might be hauled into court there, such that requiring it to defend this action in the State of Georgia does not offend traditional notions of fair play and substantial justice.

### III. FACTUAL ALLEGATIONS

20.   Plaintiffs incorporate by reference all preceding paragraphs as if fully set forth herein and further alleges as follows:

**A. Syngenta AG ("SAG")**

21.   In 1926, four British chemical companies merged to create the British company that was then known as Imperial Chemical Industries Ltd., and ultimately was known as Imperial Chemical Industries PLC ("ICI").

22.   ICI first introduced Paraquat to world markets in or about 1962 under the brand name Gramoxone.

23.   In or about 1971, ICI created or acquired a wholly-owned U.S. subsidiary organized under the laws of the State of Delaware, which at various times was known as Atlas Chemical Industries, Inc., ICI North America Inc., ICI America Inc., and ICI United States, Inc., and was ultimately know as ICI Americas Inc. ("ICI Americas").

24.   In or about 1992, ICI merged its pharmaceuticals, agrochemicals, and specialty chemicals businesses, including the agrochemicals business it had operated at one time through a wholly owned British subsidiary known as Plant Protection Ltd., and later as a division within ICI, into a wholly owned British subsidiary known as ICI Bioscience Ltd.

25.   In 1993, ICI demerged its pharmaceuticals, agrochemicals, and specialty chemicals businesses, from which it created the Zeneca Group, with the British company Zeneca Group PLC as its ultimate parent company.

26.   As a result of ICI's demerger and creation of the Zeneca Group, ICI Bioscience Ltd. was demerged from ICI and merged into, renamed, or continued its business under the same

or similar ownership and management as Zeneca Ltd., a wholly owned British subsidiary of Zeneca Group PLC.

27. Before ICI's demerger and creation of the Zeneca Group, ICI had a Central Toxicology Laboratory that performed and hired others to perform health and safety studies that were submitted to the U.S. Department of Agriculture ("USDA") and the U.S. Environmental Protection Agency to secure and maintain the registration of Paraquat and other pesticides for use in the United States.

28. As a result of ICI's demerger and creation of the Zeneca Group, ICI's Central Toxicology Laboratory became Zeneca Ltd.'s Central Toxicology Laboratory.

29. After ICI's demerger and creation of the Zeneca Group, Zeneca Ltd.'s Central Toxicology Laboratory continued to perform and hire others to perform health and safety studies that were submitted to EPA to secure and maintain the registration of Paraquat and other pesticides for use in the United States.

30. As a result of ICI's demerger and creation of the Zeneca Group, ICI Americas was demerged from ICI and merged into, renamed, or continued its business under the same or similar ownership and management as Zeneca, Inc. ("Zeneca"). Zeneca is a wholly owned subsidiary of Zeneca Group, PLC and is organized under the laws of the State of Delaware.

31. In 1996, the Swiss pharmaceutical and chemical companies Ciba-Geigy Ltd. and Sandoz AG merged to create the Novartis Group, with the Swiss company Novartis AG as the ultimate parent company.

32. As a result of the merger that created the Novartis Group, Ciba-Geigy Corporation, a wholly owned subsidiary of Ciba-Geigy Ltd. organized under the laws of the State of

New York, was merged into or continued its business under the same or similar ownership and management as Novartis Crop Protection, Inc. ("NCPI"), a wholly owned subsidiary of Novartis AG organized under the laws of the State of Delaware.

33.    In 1999, the Swedish pharmaceutical company Astra AB merged with Zeneca Group PLC to create the British company AstraZeneca PLC, of which Zeneca Ltd. and Seneca were wholly owned subsidiaries.

34.    In 2000, Novartis AG and AstraZeneca PLC spun off and merged the Novartis Group's crop protection and seeds businesses and AstraZeneca's agrochemicals business to create the Syngenta Group, a global group of companies focused solely on agribusiness, with Defendant SAG as the ultimate parent company.

35.    As a result of the Novartis/AstraZeneca spinoff and merger that created the Syngenta Group, Zeneca Ltd. was merged into, renamed, or continued its business under the same or similar ownership and management as Syngenta Ltd., a wholly owned British subsidiary of SAG.

36.    As a result of the Novartis/AstraZeneca spinoff and merger that created the Syngenta Group, Zeneca Ltd.'s Central Toxicology Laboratory became Syngenta Ltd.'s Central Toxicology Laboratory.

37.    Since the Novartis/AstraZeneca spinoff and merger that created the Syngenta Group, Syngenta Ltd.'s Central Toxicology Laboratory has continued to perform and hire others to perform health and safety studies for submission to the EPA to secure and maintain the registration of Paraquat and other pesticides for use in the United States.

38.    As a result of the Novartis/AstraZeneca spinoff and merger that created the Syngenta Group, NCPI and Zeneca were merged into and renamed, or continued to do their

business under the same or similar ownership and management, as Syngenta Crop Protection, Inc. ("SCPI"), a wholly owned subsidiary of SAG organized under the laws of the State of Delaware.

39. In 2010, SCPI was converted into Syngenta Crop Protection, LLC ("SCPLLC"), a wholly owned subsidiary of SAG organized and existing under the laws of the State of Delaware with its principal place of business in Greensboro, North Carolina.

40. SAG is a successor-in-interest to the crop protection business of its corporate predecessor Novartis AG.

41. SAG is a successor-in-interest to the crop protection business of its corporate predecessor AstraZeneca PLC.

42. SAG is a successor-in-interest to the crop protection business of its corporate predecessor Zeneca Group PLC.

43. SAG is a successor-in-interest to the crop protection business of its corporate predecessor Imperial Chemical Industries PLC, previously known as Imperial Chemical Industries Ltd.

44. SAG is a successor-in-interest to the crop protection business of its corporate predecessor ICI Bioscience Ltd.

45. SAG is a successor-in-interest to the crop protection business of its corporate predecessor Plan Protection Ltd.

46. SCPLLC is a successor-in-interest to the crop protection business of its corporate predecessor SCPI.

47. SCPLLC is a successor-in-interest to the crop protection business of its corporate predecessor NCPI.

48. SCPLLC is a successor-in-interest to the crop protection business of its corporate predecessor Ciba-Geigy Corporation.

49. SCPLLC is a successor-in-interest to the crop protection business of its corporate predecessor Zeneca Inc.

50. SCPLLC is a successor by merger or continuation of business to its corporate predecessor ICI Americas Inc., previously known as Atlas Chemical Industries Inc., ICI North Americas Inc., ICI America Inc., and ICI United States Inc.

51. SCPLLC is registered to do business in the State of Georgia, with its registered agent in Gwinnett County, Georgia.

52. SCPLLC does substantial business in the State of Georgia, including Dodge County, Georgia, including the following:

    a. Markets, advertises, distributes, sells, and delivers Paraquat and other pesticides to distributors, dealers, applicators, and farmers in the State of Georgia, including Dodge County, Georgia;

    b. Secures and maintains the registration of Paraquat and other pesticides with the EPA and the Georgia Department of Agriculture to enable itself and others to manufacture, distribute, sell, and use these products in the State of Georgia, including Dodge County, Georgia; and

    c. Performs, hires others to perform, and funds or otherwise sponsors or otherwise funds the testing of pesticides in the State of Georgia, including Dodge County, Georgia.

53. SAG is a foreign corporation organized and existing under the laws of Switzerland, with its principal place of business in Basel, Switzerland.

54. SAG is a holding company that owns stock or other ownership interests, either directly or indirectly, in other Syngenta Group companies, including SCPLLC.

55. SAG is a management holding company.

56. Syngenta Crop Protection AG ("SCPAG") is a Swiss corporation with its principal place of business in Basel, Switzerland. SCPAG is one of SAG's direct and wholly owned subsidiaries.

57. SCPAG employs the global operational managers of production, distribution, and marketing for the Syngenta Group's Crop Protection and Seeds Divisions.

58. The Syngenta Group's Crop Protection and Seeds Divisions are the business units through which SAG manages its crop protection and seeds product lines.

59. The Syngenta Group's Crop Protection and Seeds Divisions are not and have never been corporations or other legal entities.

60. SCPAG directly and wholly owns Syngenta International AG ("SIAG").

61. SIAG is the "nerve center" through which SAG manages the entire Syngenta Group.

62. SIAG employs the "Heads" of the Syngenta Group's Crop Protection and Seeds Divisions.

63. SIAG also employs the "Heads" and senior staff of various global functions of the Syngenta Group, including Human Resources, Corporate Affairs, Global Operations, Research and Development, Legal and Taxes, and Finance.

64. Virtually all of the Syngenta Group's global "Heads" and their senior staff are housed in the same office space in Basel, Switzerland.

65. SAG is the indirect parent of SCPLLC through multiple layers of corporate ownership:

    a. SAG directly and wholly owns Syngenta Participations AG;

      b.   Syngenta Participations AG directly and wholly owns Sees JV C.V.;

      c.   Sees JC C.V. directly and wholly owns Syngenta Corporation;

      d.   Syngenta Corporation directly and wholly owns Syngenta Sees, LLC;

      e.   Syngenta Seeds, LLC directly and wholly owns SCPLLC.

66.    Before SCPI was converted to SCPLLC, it was incorporated in Delaware, had its principal place of business in North Carolina, and had its own board of directors.

67.    SCPI's sales accounted for more than 47% of the sales for the entire Syngenta Group in 2019.

68.    SAG has purposefully organized the Syngenta Group, including SCPLLC, in such a way as to attempt to evade the authority of courts in jurisdictions in which it does substantial business.

69.    Although the formal legal structure of the Syngenta Group is designed to suggest otherwise, SAG in fact exercises an unusually high degree of control over its country-specific business units, including SCPLLC, through a "matrix management" system of functional reporting to global "Product Heads" in charge of the Syngenta Group's unincorporated Crop Protection and Seeds Divisions, and to global "Functional Heads" in charge of human resources, corporate affairs, global operations, research and development, legal and taxes, and finance.

70.    The lines of authority and control within the Syngenta Group do not follow its formal legal structure, but instead follow this global "functional" management structure.

71.    SAG controls the actions of its far-flung subsidiaries, including SCPLLC, through this global "functional" management structure.

72.   SAG's board of directors has established a Syngenta Executive Committee ("SEC"), which is responsible for the active leadership and the operative management of the Syngenta Group, including SCPLLC.

73.   The SEC consists of the CEO and various global heads, which currently are:

    a.   The Chief Executive Officer;

    b.   Group General Counsel;

    c.   The President of Global Crop Protection;

    d.   The Chief Financial Officer;

    e.   The President of Global Sees; and

    f.   The Head of Human Resources;

74.   SIAG employs all of the members of the SEC.

75.   Global Syngenta Group corporate policies require SAG subsidiaries, including SCPLLC, to operate under the direction and control of the SEC and other unincorporated global management teams.

76.   SAG's board of directors meets five to six times a year.

77.   In contrast, SCPI's board of directors rarely met, either in person or by telephone, and met only a handful of times over the decade before SCPI became SCPLLC.

78.   Most, if not all, of the SCPI board's formal actions, including selecting and removing SCPI officers, were taken by unanimous written consent pursuant to directions from the SEC or other Syngenta Group global or regional managers that were delivered via e-mail to SCPI board members.

79.   Since SCPI became SCPLLC, decisions that are nominally made by the board or managers of SCPLLC in fact continue to be directed by the SEC or other Syngenta Group global or regional managers.

80.   Similarly, Syngenta Seeds, Inc.'s board of directors appointed and removed SCPI board members at the direction of the SEC or other Syngenta Group global or regional managers.

81.   Since SCPI became SCPLLC, the appointment and removal of the manager(s) of SCPLLC continues to be directed by the SEC or other Syngenta Group global or regional managers.

82.   The management structure of the Syngenta Group's CP Division, of which SCPLLC is a part, is not defined by legal, corporate relationships, but by functional reporting relationships that disregard corporate boundaries.

83.   Atop the Crop Protection Division is the Crop Protection Leadership Team (or another body with a different name, but substantially the same composition and functions), which includes the President of Global Crop Protection, the Crop Protection Region Heads (including SCPLLC President Vern Hawkins), and various global corporate function heads.

84.   The Crop Protection Leadership Team meets bi-monthly to develop strategy for new products, markets, and operational efficiencies, and to monitor performance of the Syngenta Group's worldwide crop protection business.

85.   Under the Crop Protection Leadership Team are regional leadership teams, including the North America Regional Leadership Team (or another body with a different name but substantially the same composition and functions), which oversees the Syngenta Group's

U.S. and Canadian crop protection business (and when previously known as the NAFTA Regional Leadership Team, also oversaw the Syngenta Group's Mexican crop protection business).

86. The Syngenta Group's U.S. and Canadian crop protection companies, including SCPLLC, report to the North America Regional Leadership Team, which reports to the Crop Protection Leadership Team, which reports to the SEC, which reports to SAG's board of directors.

87. Some members of the North America Regional Leadership Team, including some SCPLLC employees, report, or have in the past reported, not to their nominal superiors within the companies that employ them, but directly to the Syngenta Group's global heads.

88. Syngenta Group global heads that supervise SCPLLC employees participate and have in the past participated in the performance reviews of these employees and in setting their compensation.

89. The Syngenta Group's functional reporting lines have resulted in employees of companies, including SCPLLC, reporting to officers of remote parent companies, officers of affiliates with no corporate relationship other than through SAG, or officers of subsidiary companies.

90. SCPLLC performs its functions according to its role in the Crop Protection Division structure:

   a. Crop Division development projects are proposed at the global level, ranked and funded at the global level after input from functional entities such as the Crop

Protection Leadership Team and the North America Regional Leadership Team, and given final approval by the SEC;

b. New crop protection products are developed by certain Syngenta Group companies or functional groups that manage and conduct research and development functions for the entire Crop Protection Division;

c. These products are then tested by other Syngenta Group companies, including SCPLLC, under the direction and supervision of the SEC, the Crop Protection Leadership Team, or other Syngenta Group global managers;

d. Syngenta Group companies, including SCPLLC, do not contract with or compensate each other for this testing;

e. Rather, the cost of such testing is included in the testing companies' operative budgets, which are established and approved by the Syngenta Group's global product development managers and the SEC;

f. If a product shows promise based on this testing and the potential markets for the product, either global or regional leaders (depending on whether the target market is global or regional), not individual Syngenta Group companies such as SCPLLC, decide whether to sell the product;

g. Decisions to sell the product must be approved by the SEC;

h. The products that are sold all bear the same Syngenta trademark and logo.

91. SCPLLC is subject to additional oversight and control by Syngenta Group global managers through a system of "reserved powers" established by SAG and applicable to all Syngenta Group Companies.

92.    These "reserved powers" require Syngenta Group companies to seek approval for certain

decisions from higher levels within the Syngenta Group's functional reporting structure.

93.    For example, although SAG permits Syngenta Group companies to handle small legal

matters on their own, under the "reserved powers" system, SAG's Board of Directors

must approve settlements of certain types of lawsuits against Syngenta Group companies,

including SCPLLC, if their value exceeds an amount specified in the "reserved powers."

94.    Similarly, the appointments of senior managers at SCPLLC must be approved by higher

levels than SCPLLC's own management, board of directors, or even its direct legal

owner.

95.    Although SCPLLC takes the formal action necessary to appoint its own senior managers,

this formal action is in fact merely the rubber-stamping of decisions that have already

been made by the Syngenta Group's global management.

96.    Although SAG subsidiaries, including SCPLLC, pay lip service to legal formalities that

give the appearance of authority to act independently, in practice many of their actions

are directed or pre-approved by the Syngenta Group's global management.

97.    SAG and the global management of the Syngenta Group restricts the authority of

SCPLLC to act independently in areas which include:

   a. Product development;

   b. Product testing (among other things, SAG and the global management of the

      Syngenta Group require SCPLLC to use Syngenta Ltd.'s Central Toxicology

      Laboratory to design, perform, or oversee product safety testing that SCPLLC

      submits to the EPA in support of the registration of Paraquat and other

      pesticides);

    c.  Production;

    d.  Marketing;

    e.  Sales;

    f.  Human resources;

    g.  Communications and public affairs;

    h.  Corporate structure and ownership;

    i.  Asset sales and acquisitions;

    j.  Key appointments to boards, committees, and management positions;

    k.  Compensation packages;

    l.  Training for high-level positions; and

    m.  Finance (including day-to-day cash management) and tax.

98.    Under the Syngenta Group's functional management system, global managers initiate, and the global Head of Human Resources oversees, international assignments and compensation of managers employed by one Syngenta subsidiary to do temporary work for another Syngenta subsidiary in another country. This international assignment program aims, in part, to improve Syngenta Group-wide succession planning by developing corporate talent to make employees fit for higher positions within the global Syngenta Group of companies.

99.    Under this international, at the instance of Syngenta Group global managers, SCPLLC officers and employees have been "seconded" to work at other SAG subsidiaries, and officers and employees of other Syngenta Group subsidiaries have been "seconded" to work at SCPLLC.

100. The Syngenta Group's functional management system includes a central global finance function—known as Syngenta Group Treasury—for the entire Syngenta Group.

101. The finances of all Syngenta Group companies are governed by a global treasury policy that subordinates the financial interests of SAG's subsidiaries, including SCPLLC, to the interests of the Syngenta Group as a whole.

102. Under the Syngenta Group's global treasury policy, Syngenta Group Treasury controls daily cash sweeps from subsidiaries such as SCPLLC, holds the cash on account, and lends it to other subsidiaries that need liquidity.

103. The Syngenta Group's global treasury policy does not allow SAG subsidiaries such as SCPLLC to seek or obtain financing from non-Syngenta entities without the approval of Syngenta Group Treasury.

104. Syngenta Group Treasury also decides whether SCPLLC will issue a dividend or distribution to its direct parent company, and how much that dividend will be.

105. SCPLLC's board or management approves dividends and distributions mandated by Syngenta Group Treasury without any meaningful deliberation.

106. In 2011, the U.S. District Court for the Southern District of Illinois held that SAG's unusually high degree of control over SCPLLC made SCPLLC the agent or alter ego of SAG and therefore subjected SAG to jurisdiction in the State of Illinois. *See City of Greenville, Ill. V. Syngenta Crop Protection, Inc.,* 830 F. Supp. 2d 550 (S.D. Ill. 2011).

107. SAG continues to exercise the unusually high degree of control over SCPLLC that led the District Court to find in 2011 that SAG was subject to jurisdiction in the State of Illinois.

108. SAG, through its agent or alter ego, SCPLLC, does substantial business in the State of Georgia, including Dodge County, Georgia, in the ways previously alleged as to SCPLLC.

## B. Chevron U.S.A. Inc. ("Chevron USA")

109. Chevron Chemical Company ("Chevron Chemical") was a corporation organized in 1928 under the laws of the State of Delaware.

110. In 1997, Chevron Chemical was merged into Chevron Chemical Company, LLC ("Chevron Chemical LLC"), a limited liability company organized under the laws of the State of Delaware.

111. In the mid-2000s, Chevron Chemical LLC was merged into or continued to operate under the same or similar ownership and management as Chevron Phillips Chemical Company, LP ("CP Chemical").

112. CP Chemical is a successor-in-interest to the crop protection business of its corporate predecessor Chevron Chemical LLC.

113. CP Chemical is a successor-in-interest by merger or continuation of business to its corporate predecessor Chevron Chemical.

114. Defendant Chevron U.S.A., Inc. ("Chevron USA") is a corporation organized and existing under the laws of the State of Pennsylvania, with its principal place of business in the State of California.

115. Defendant Chevron USA is a successor-in-interest to the crop protection business of its corporate predecessor Chevron Chemical LLC.

116.   Defendant Chevron USA is a successor-in-interest to the crop protection business of its corporate predecessor CP Chemical.

117.   Chevron USA is registered to do business in Georgia, with the office of its registered agent in Gwinnett County, Georgia.

118.   In the mid-2000s, Chevron USA entered into an agreement in which it expressly assumed the liabilities of Chevron Chemical and Chevron Chemical LLC arising from Chevron Chemical's then discontinued agrichemical business, which included the design, registration, manufacture, formulation, packaging, labeling, distribution, marketing, and sale of Paraquat products in the United States as alleged in this complaint.

119.   From approximately 1964 through approximately 1986, pursuant to distribution and licensing agreements with Chevron Chemical Company, Syngenta AG and/or Syngenta Crop Protection, LLC's predecessors-in-interest, ICI and ICI Americas manufactured some or all of the Paraquat that Chevron Chemical Company distributed and sold in the United States, including in Georgia for use in Georgia.

### C. Paraquat Manufacture, Distribution, and Sale

120.   ICI, a legacy company of Syngenta, claims to have discovered the herbicidal properties of Paraquat in 1955.

121.   The leading manufacturer of Paraquat is Syngenta which (as ICI) developed the active ingredient in Paraquat in the early 1960s.

122.   ICI produced the first commercial Paraquat formulation and registered it in England in 1962.

123.   Paraquat was marketed in 1962 under the brand name Gramoxone.

124.   Paraquat first became commercially available for use in the United States in 1964.

125.    In or about 1964, ICI and Chevron Chemical entered into agreements regarding the
        licensing and distribution of Paraquat ("the ICI-Chevron Chemical Agreements").

126.    In or about 1971, ICI Americas became a party to the ICI-Chevron Chemical Agreements
        on the same terms as ICI.

127.    The ICI-Chevron Chemical Agreements were renewed or otherwise remained in effect
        until about 1986.

128.    In the ICI-Chevron Chemical Agreements, ICI and ICI Americas granted Chevron
        Chemical a license to their patents and technical information to permit Chevron Chemical
        to formulate or have formulated, use, and sell Paraquat in the United States and to grant
        sub-licenses to others to do so.

129.    In the ICI-Chevron Chemical Agreements, Chevron Chemical Granted ICI and ICI
        Americas a license to its patents and technical information to permit ICI and ICI
        Americas to formulate or have formulated, use, and sell Paraquat throughout the world
        and to grant sub-licenses to others to do so.

130.    In the ICI-Chevron Chemical Agreements, ICI and ICI Americas and Chevron Chemical
        agreed to exchange patent and technical information regarding Paraquat.

131.    In the ICI-Chevron Chemical Agreements, ICI and ICI Americas granted Chevron
        Chemical exclusive rights to distribute and sell Paraquat in the United States.

132.    In the ICI-Chevron Chemical Agreements, ICI and ICI Americas granted Chevron
        Chemical a license to distribute and sell Paraquat in the United States under the ICI-
        trademarked brand name Gramoxone.

133.    ICI and ICI Americas and Chevron Chemical entered into the ICI-Chevron Chemical
        Agreements to divide the worldwide market for Paraquat between them.

134. Under the ICI-Chevron Chemical Agreements, Chevron Chemical distributed and sold Paraquat in the United States and ICI and ICI Americas distributed and sold Paraquat outside the United States.

135. Under the ICI-Chevron Chemical Agreements and related agreements, both ICI and ICI Americas and Chevron Chemical distributed and sold Paraquat under the ICI-trademarked brand name Gramoxone.

136. Under the ICI-Chevron Chemical Agreements, ICI, ICI Americas, and Chevron Chemical exchanged patent and technical information regarding Paraquat.

137. Under the ICI-Chevron Chemical Agreements, ICI and ICI Americas provided to Chevron Chemical health and safety, and efficacy studies performed or procured by ICI's Central Toxicology Laboratory, which Chevron Chemical then submitted to the USDA and the EPA to secure and maintain the registration of Paraquat for manufacture, formulation, distribution, and sale for use in the United States.

138. Under the ICI-Chevron Chemical Agreements and related agreements, ICI and ICI Americas manufactured and sold Paraquat to Chevron Chemical that Chevron Chemical then distributed and sold in the United States, including in Georgia, where Chevron Chemical registered Paraquat products with the Georgia Department of Agriculture and marketed, advertised, and promoted them to Georgia distributors, dealers, applicators, and farmers.

139. Under the ICI-Chevron Chemical Agreements and related agreements, Chevron Chemical distributed and sold Paraquat in the United States under the ICI-trademarked brand name Gramoxone, and other names, including in Georgia, where Chevron Chemical registered such products with the Georgia Department of Agriculture to enable them to be lawfully

distributed, sold, and used in Georgia, and marketed, advertised, and promoted them to Georgia distributors, dealers, applicators, and farmers.

140. SAG and its corporate predecessors and others with whom they acted in concert have manufactured, formulated, distributed, and sold Paraquat for use in the United States from about 1964 through the present, and at all relevant times intended or expected their Paraquat products to be distributed and sold in Georgia, where they registered such products with the Georgia Department of Agriculture to enable them to be lawfully distributed, sold, and used in Georgia, and marketed, advertised, and promoted them to Georgia distributors, dealers, applicators, and farmers.

141. SAG and its corporate predecessors and others with whom they acted in concert have submitted health and safety and efficacy studies to the USDA and the EPA to support the registration of Paraquat for manufacture, formulation, distribution, and sale for use in the United States from about 1964 through the present.

142. Chevron Chemical manufactured, formulated, distributed, and sold Paraquat for use in the United States from about 1964 through at least 1986, acting in concert with ICI and ICI Americas throughout this period, including in Georgia, where Chevron Chemical registered such products with the Georgia Department of Agriculture to enable them to be lawfully distributed, sold, and used in Georgia, and marketed, advertised, and promoted them to Georgia distributors, dealers, applicators, and farmers.

### D. Plaintiff's Use of Paraquat

143. At all relevant times, Plaintiff Michael Johnson worked in agriculture. Michael mixed and applied Paraquat at his family's farm and peanut business.

144. In this capacity Plaintiff Michael Johnson was exposed to Paraquat in the 1970's and 1980's:

   a. When it was mixed, loaded, applied, and/or cleaned

   b. As a result of spray drift (the movement of herbicide spray droplets from the target area to an area where herbicide application was not intended, typically by wind); and/or

   c. As a result of contact with sprayed plants.

145. Michael was exposed to and inhaled, ingested, or absorbed Paraquat when applying it on his fields by tractor and at his family's peanut company property with a hand sprayer.

146. Plaintiff Michael Johnson began noticing the symptoms of Parkinson's Disease In approximately 2008. Michael Johnson has been seeking medical treatment under the diagnosis of Parkinson's Disease since 2012.

147. No doctor or any other person told Michael Johnson before mid-2021 that his Parkinson's Disease was or could have been caused by exposure to Paraquat.

148. Before mid-2021, Michael Johnson had never read or heard of any articles in newspapers, scientific journals, or other publications that associated Parkinson's Disease with Paraquat.

149. Before mid-2021, Michael Johnson had never read or heard of any lawsuit alleging that Paraquat causes Parkinson's Disease.

150. At no time when using Paraquat himself was Michael Johnson aware that exposure to Paraquat could cause any latent injury, including any neurological injury or

Parkinson's Disease, or that any precautions were necessary to prevent any latent injury caused by exposure to Paraquat.

151.  The Paraquat to which Michael Johnson was exposed was sold and used in Georgia, and was manufactured, distributed, and on information and belief sold by one or more of the Defendants and their corporate predecessors, and others with whom they acted in concert intending or expecting it would be sold and used in Georgia

152.  On information and belief, Michael Johnson was exposed to Paraquat manufactured, distributed, and sold at different times as to each Defendant, its corporate predecessors, and others with whom they acted in concert, and not necessarily throughout the entire period of his exposure as to any particular Defendant, its corporate predecessors, and others with whom they acted in concert.

153.  On information and belief, Michael Johnson was exposed to Paraquat that was sold and used in Georgia, and was manufactured, distributed, and sold by SAG, its corporate predecessors, and others with whom they acted in concert, including Chevron Chemical, intending or expecting that it would be sold and used in Georgia.

154.  On information and belief, Michael Johnson was exposed to Paraquat that was sold and used in Georgia, and was manufactured, distributed, and sold by Chevron Chemical, acting in concert with ICI and ICI Americas and others, intending or expecting that it would be sold and used in Georgia.

    **E. Paraquat Use**

155.  Since 1964, Paraquat has been used in the United States to kill broadleaf weeds and grasses before the planting or emergence of more than 100 field, fruit, vegetable, and plantation crops, to control weeds in orchards, and to desiccate (dry) plants before

harvest. At all relevant times, the use of Defendants' Paraquat for these purposes was intended or directed by, or reasonably foreseeable to, and was known to or foreseen by Defendants.

156. At all relevant times, where Paraquat was used, it was commonly used multiple times per year on the same land, particularly when used to control weeds in orchards or on farms with multiple crops planted on the same land within a single growing season or year, and such use was as intended, or directed, or reasonably foreseeable. The use of Defendants' Paraquat for these purposes was intended or directed by or reasonably foreseeable to, and was known to or foreseen by Defendants.

157. At all relevant times, Paraquat manufactured, distributed, sold, and sprayed or caused to be sprayed by Defendants, Defendants' corporate predecessors, and others with whom they acted in concert was typically sold to end-users in the form of liquid concentrates (and less commonly in the form of granular solids) designed to be diluted with water before or after loading it into the tank of a sprayer and applied by spraying it onto target weeds.

158. At all relevant times, concentrates containing Paraquat manufactured, distributed, sold, and sprayed or caused to be sprayed by Defendants, Defendants' corporate predecessors, and others with whom they acted in concert typically were formulated with one or more "surfactants" to increase the ability of the herbicide to stay in contact with the leaf, penetrate the leaf's waxy surface, and enter into plant cells, and the accompanying instructions typically told end-users to add a surfactant or crop oil (which as typically formulated contains a surfactant) before use.

159.   At all relevant times, Paraquat typically was applied with a knapsack sprayer, hand-held sprayer, aircraft (i.e. crop duster), truck with attached pressurized tank, or tractor-drawn pressurized tank, and such use was intended, or directed, or reasonably foreseeable.

### F. Paraquat Exposure

160.   At all relevant times, it was reasonably foreseeable that when Paraquat was used in the manner intended, or directed, or in a reasonably foreseeable manner, users of Paraquat and persons nearby would be exposed to Paraquat while it was being mixed and loaded into the tanks of sprayers, including as a result of spills, splashes, and leaks.

161.   At all relevant times, it was reasonably foreseeable that when Paraquat was used in the manner intended, or directed, or in a reasonably foreseeable manner, persons who sprayed Paraquat or were in or near areas where it was being or recently had been sprayed would be exposed to Paraquat, including as a result of spray drift, the movement of herbicide spray droplets from the target area to an area where herbicide application was not intended, typically by wind, as a result of contact with sprayed plants.

162.   At all relevant times, it was reasonably foreseeable that when Paraquat was used in the manner intended, or directed, or in a reasonably foreseeable manner, users of Paraquat, and persons nearby would be exposed to Paraquat, including as a result of spills, splashes, and leaks, while equipment was used to spray it was being emptied, or cleaned, or clogged spray nozzles, lines, or valves were being cleared.

163.   At all relevant times, it was reasonably foreseeable that Paraquat could enter the human body via absorption through or penetration of the skin, mucous membranes, and other epithelial tissues, including tissues of the mouth, nose, and nasal passages, trachea, and

conducting airways, particularly where cuts, abrasions, rashes, sores, or other tissue damage was present.

164. At all relevant times, it was reasonably foreseeable that Paraquat could enter the human body via respiration into the lungs, include the deep parts of the lungs where respiration (gas exchange) occurs.

165. At all relevant times, it was reasonably foreseeable that Paraquat could enter the human body via ingestion into the digestive tract of small droplets swallowed after entering the mouth, nose, or conducting airways.

166. At all relevant times, it was reasonably foreseeable that Paraquat that entered the human body via ingestion into the digestive tract could enter the enteric nervous system (the part of the nervous system that governs the function of the gastrointestinal tract).

167. At all relevant times, it was reasonably foreseeable that Paraquat that entered the human body, whether via ingestion, absorption, or respiration could enter the bloodstream.

168. At all relevant times, it was reasonably foreseeable that Paraquat which entered the bloodstream could enter the brain, whether through the blood-brain barrier or parts of the brain not protected by the blood-brain barrier.

169. At all relevant times, it was reasonably foreseeable that Paraquat that entered the nose and nasal passages could enter the brain through the olfactory bulb (a part of the brain involved in the sense of smell), which is not protected by the blood-brain barrier.

### G. Parkinson's Disease

170. Parkinson's Disease is a progressive neurodegenerative disorder of the brain that affects primarily the motor system, the part of the central nervous system that controls movement.

171.    Scientists who study Parkinson's Disease generally agree that fewer than 10% of all Parkinson's Disease cases are caused by inherited genetic mutations alone, and that more than 90% are caused by a combination of environmental factors, genetic susceptibility, and the aging process.

172.    The characteristic symptoms of Parkinson's Disease are its "primary" motor symptoms:

      a.    Resting tremor (shaking movement when the muscles are relaxed);

      b.    Bradykinesia (slowness in voluntary movement and reflexes);

      c.    Rigidity (stiffness and resistance to passive movement); and

      d.    Postural instability (impaired balance).

173.    Parkinson's Disease's primary motor symptoms often result in "secondary" motor symptoms such as freezing of gait, shrinking handwriting, impaired coordination, difficulty swallowing, and excess saliva and drooling caused by reduced swallowing movements.

174.    Non-motor symptoms such as loss of or altered sense of smell, constipation, low blood pressure on rising to stand, sleep disturbances, and depression are present in most cases of Parkinson's Disease, often for years before any of the primary motor symptoms appear.

175.    There is currently no cure for Parkinson's Disease. No treatment will slow, stop, or reverse its progression. The treatments most commonly prescribed for its motor symptoms tend to become progressively less effective, and cause unwelcome side effects, the longer they are used.

176.     The selective degeneration and death of dopaminergic neurons (dopamine producing nerve cells) in a part of the brain called the substantia nigra pars compacta ("SNpc") is one of the primary pathophysiological hallmarks of Parkinson's Disease.

177.     Dopamine is a neurotransmitter (a chemical messenger that transmits signals from one neuron to another neuron, muscle cell, or gland cell) that is critical to the brain's control of motor function, among other things.

178.     The death of dopaminergic neurons in the SNpc decreases the production of dopamine.

179.     Once dopaminergic neurons die, they are not replaced. When enough dopaminergic neurons have died, dopamine production falls below the level the brain requires for proper control of motor function, resulting in the motor symptoms of Parkinson's Disease.

180.     The presence of Lewy bodies (insoluble aggregates of a protein called alpha-synuclein) in many of the remaining dopaminergic neurons in the SNpc is another of the primary pathophysiological hallmarks of Parkinson's Disease.

181.     Dopaminergic neurons are particularly susceptible to oxidative stress, a disturbance in the normal balance between oxidants present in cells and cells' antioxidant defenses.

182.     Scientists who study Parkinson's Disease generally agree that oxidative stress is a major factor in, if not the precipitating cause of, the degeneration and death of dopaminergic neurons in the SNpc, and that the accumulation of Lewy bodies in the remaining dopaminergic neurons that are the primary pathophysiological hallmarks of the disease.

### H. Paraquat's Toxicity

183.     Paraquat is highly toxic to both plants and animals.

184.    Paraquat injures and kills plants by creating oxidative stress that causes or contributes to
        cause the degeneration and death of plant cells.

185.    Paraquat injures and kills plants by creating oxidative stress that causes or contributes to
        cause the degeneration and death of animal cells.

186.    Paraquat creates oxidative stress in the cells of plants and animals because of "redox
        properties" that are inherent in its chemical composition and structure: it is a strong
        oxidant, and it readily undergoes "redox cycling" in the presence of molecular oxygen,
        which is plentiful in living cells.

187.    The redox cycling of Paraquat in living cells interferes with cellular functions that are
        necessary to sustain life (with photosynthesis in plant cells, and with cellular respiration
        in animal cells).

188.    The redox cycling of Paraquat in living cells creates a "reactive oxygen species" known
        as superoxide radical, an extremely reactive molecule that can initiate a cascading series
        of chemical reactions that create other reactive oxygen species which damage lipids,
        proteins, and nucleic acids (molecules that are essential components of the structures and
        functions of living cells).

189.    Because the redox cycling of Paraquat can repeat indefinitely in the conditions typically
        present in living cells, a single molecule of Paraquat can trigger the production of
        countless molecules of destructive superoxide radical.

190.    Paraquat's redox properties have been known to science since at least the 1930s.

191.    That Paraquat is toxic to the cells of plants and animals because it creates oxidative stress
        through redox cycling has been known since at least the 1960s.

192.    The surfactants with which the concentrates containing Paraquat manufactured,
        distributed, and sold by Defendants, Defendants' corporate predecessors, and others with
        whom they acted in concert typically were formulated were likely to increase Paraquat's
        toxicity to humans by increasing its ability to stay in contact with or penetrate the skin,
        mucous membranes, and other epithelial tissues, including tissues of the mouth, nose, and
        nasal passages, trachea, and conducting airways, the lungs, and the gastrointestinal tract.

        ## I.    Paraquat and Parkinson's

193.    The same redox properties that make Paraquat toxic to plant cells and other types of
        animal cells make it toxic to dopaminergic neurons-Paraquat is a strong oxidant that
        interferes with the function of, damages, and ultimately kills dopaminergic neurons by
        creating oxidative stress through redox cycling.

194.    Although Parkinson's Disease is not known to occur naturally in any species other than
        humans, Parkinson's Disease research is often performed using "animal models," in
        which scientists artificially produce conditions that show features of Parkinson's Disease
        in laboratory animals.

195.    Paraquat is one of only a handful of toxins that scientists use to produce animal models of
        Parkinson's Disease.

196.    In animal models of Parkinson's Disease, hundreds of studies involving various routes of
        exposure have found that Paraquat creates oxidative stress that results in the degeneration
        and death of dopaminergic neurons in the SNpc, other pathophysiology consistent with
        that seen in human Parkinson's Disease, and motor deficits and behavioral changes
        consistent with those commonly seen in human Parkinson's Disease.

197.   Hundreds of in vitro studies (experiments in a test tube, culture dish, or other controlled experimental environment) have found that Paraquat creates oxidative stress that results in the degermation and death of dopaminergic neurons (and many other types of animal cells).

198.   Many epidemiological studies (studies of the patterns and causes of disease in defined populations) have found that exposure to Paraquat significantly increases the risk of contracting Parkinson's Disease, including multiple studies finding a two- to five-fold or greater increase in the risk of Parkinson's Disease in populations with occupational exposure to Paraquat compared to populations without such exposure.

### J. Paraquat Regulation

199.   The Federal Insecticide, Fungicide, and Rodenticide Act ("FIFRA"), 7 U.S.C. §136 et seq., which regulates the distribution, sale, and use of pesticides within the United States, requires that pesticides be registered with the U.S. Environmental Protection Agency ("EPA") prior to their distribution, sale, or use, except as described by FIFRA. 7. U.S.C.§ 136a(a).

200.   Paraquat is a "restricted use pesticide" under federal law, see 40 C.F.R. § 152.175, which means it is "limited to use by or under the direct supervision of a certified applicator."

201.   As part of the pesticide registration process, the EPA requires, among other things, a variety of tests to evaluate the potential for exposure to pesticides, toxicity to people and other potential non-target organisms, and other adverse effects on the environment.

202.   As a general rule, FIFRA requires registrants, the chemical companies registered to sell the pesticides, to perform health and safety testing of pesticides. However, FIFRA does

not require the EPA itself to perform health and safety testing of pesticides, and the EPA generally does not perform such testing.

203. The EPA registers (or re-registers) a pesticide if it is persuaded, based largely on studies and data submitted by the registrant, that:

   a. Its composition is such as to warrant the proposed claims for it. 7. U.S.C. § 136a(c)(5)(A);

   b. Its labeling and other material required to be submitted comply with the requirements of FIFRA. 7 U.S.C. § 136a(c)(5)(B);

   c. It will perform its intended function without unreasonable adverse effects on the environment. 7 U.S.C. 136a(c)(5)(C); and

   d. When used in accordance with widespread and commonly recognized practice it will not generally cause unreasonable adverse effects on the environment. 7 U.S.C. 136a(c)(5)(D).

204. FIFRA defines "unreasonable adverse effects on the environment" and "any unreasonable risk to man or the environment, taking into account the economic, social, and environmental costs and benefits of the use of any pesticide." 7 U.S.C. § 136(bb).

205. Under FIFRA, "[a]s long as no cancellation proceedings are in effect registration of a pesticide shall be prima facie evidence that the pesticide, its labeling and packaging comply with the registration provisions of [FIFRA]." 7 U.S.C. § 136a(f)(2).

206. However, FIFRA further provides that "[i]n no event shall registration of an article be construed as a defense for the commission of any offense under [FIFRA]." 7 U.S.C. § 136a(f)(2).

207.    The distribution or sale of a pesticide that is misbranded is an offense under FIFRA,

which provides in relevant part that "it shall be unlawful for any person in any State to

distribute or sell to any person...any pesticide which is...misbranded." 7 U.S.C. §

136j(a)(1)(E).

208.    A pesticide is misbranded under FIFRA if, among other things:

    a.  Its labeling bears any statement, designed or graphic representation relative

       thereto or to its ingredients which is false or misleading in any particular. 7 U.S.C.

       § 136(q)(1)(A);

    b.  The labeling accompanying it does not contain directions for use which are

       necessary for effecting the purpose for which the product is intended and if

       complied with, together with any requirements imposed under section 136a(d) of

       this title, are adequate to protect health and the environment. 7 U.S.C. §

       136(q)(1)(F); or

    c.  The label does not contain a warning or caution statement which may be

       necessary and if complied with, together with any requirements imposed under

       section 136a(d) of this title, is adequate to protect health and the environment. 7

       U.S.C. § 136(q)(1)(G).

209.    As a result, a pesticide may be misbranded despite an EPA determination that it met

FIFRA's registration criteria. In other words, notwithstanding its registration, a pesticide

is misbranded if its label contains "false or misleading" statements, has inadequate

instructions for use, or omits warnings or cautionary statements necessary to protect

human health. Similarly, a pesticide may be found to cause unreasonable adverse effects

on humans when used according to the approved label despite a determination by the
EPA that it would not.

210.  Plaintiffs do not seek in this action to impose on Defendants any labeling or packaging
requirement(s) in addition to, or different from, those required under FIFRA. Any
allegation in this Complaint that a Defendant breached a duty to provide adequate
directions for the use of or warnings about Paraquat, breached a duty to provide adequate
packaging for Paraquat, concealed, suppressed, or omitted to disclose any material fact
about Paraquat, or engaged in any unfair or deceptive practice regarding Paraquat, is
intended and should be construed to be consistent with that alleged breach, concealment,
suppression, omission, or unfair or deceptive practice having rendered the Paraquat
"misbranded" under FIFRA. However, Plaintiffs bring claims and seeks relief in this
action only under state law, and do not bring any claims or seek any relief in this action
under FIFRA.

## IV.     CAUSES OF ACTION

### A. First Cause of Action - Strict Products Liability Design Defect

211.  Plaintiffs incorporate by reference all preceding paragraphs as if fully set forth herein and
further alleges as follows:

212.  At all relevant times, Defendants, Defendants' corporate predecessors, and others with
whom they acted in concert were engaged in the U.S. Paraquat business.

213.  At all relevant times, Defendants, Defendants' corporate predecessors, and others with
whom they acted in concert were engaged in the business of designing, manufacturing,
distributing, and selling pesticides, and designed, manufactured, distributed, and sold
Paraquat intended or expecting that it would be sold and used in Georgia.

214. Michael Johnson was exposed to Paraquat sold and used in Georgia that Defendants, Defendants' corporate predecessors, and others with whom they acted in concert designed, manufactured, distributed, and sold intending, or expecting that it would be sold and used in Georgia.

215. The Paraquat that Defendants, Defendants' corporate predecessors, and others with whom they acted in concert designed, manufactured, distributed, and sold, and to which Plaintiff Michael Johnson was exposed was defective, and thus unreasonably dangerous, in that when used in the intended and directed manner or a reasonably foreseeable manner:

    a. It was designed, manufactured, formulated, and packaged such that it was likely to be inhaled, ingested, and absorbed into the bodies of persons who used it, who were nearby while it was being used, or who entered fields or orchards where it had been sprayed or areas near where it had been sprayed; and

    b. When inhaled, ingested, or absorbed into the bodies of persons who used it, who were nearby while it was being used, or who entered fields or orchards where it had been sprayed or areas near where it had been sprayed, it was likely to cause or contribute to cause latent neurological damage that was both permanent and cumulative, and repeated exposures were likely to cause or contribute to cause clinically significant neurodegenerative disease, including Parkinson's Disease.

216. This defective condition existed in the Paraquat that Defendants, Defendants' corporate predecessors, and others with whom they acted in concert designed, manufactured, distributed, and sold, and to which Michael Johnson was exposed when it left the control of Defendants, Defendants' corporate predecessors, and others with whom they

acted in concert and was placed into the stream of commerce.

217. As a result of this defective condition, the Paraquat that Defendants, Defendants' corporate predecessors, and others with whom they acted in concert designed, manufactured, distributed, and sold, and to which Michael Johnson was exposed either failed to perform in the manner reasonably to be expected in light of its nature and intended function, or the magnitude of the dangers outweighed its utility.

218. The Paraquat that Defendants, Defendants' corporate predecessors, and others with whom they acted in concert designed, manufactured, distributed, and sold and to which Michael Johnson was exposed was used in the intended and directed manner or a reasonably foreseeable manner.

219. As a direct and proximate result of the defective and unreasonably dangerous condition of the Paraquat manufactured, distributed, and sold by SAG, its corporate predecessors, and others with whom they acted in concert, Plaintiff Johnson developed Parkinson's Disease; has suffered severe and permanent physical pain, mental anguish, and disability, and will continue to do so for the remainder of his life; has suffered the loss of a normal life and will continue to do so for the remainder of his life; has lost income that he otherwise would have earned and will continue to do so for the remainder of his life; and has incurred reasonable expenses for necessary medical treatment and will continue to do so for the rest of his life.

220. As a direct and proximate result of the defective and unreasonably dangerous condition of the Paraquat manufactured, distributed, and sold by Chevron USA, its corporate predecessors, and others with whom they acted in concert, Plaintiff Johnson developed Parkinson's Disease; has suffered severe and permanent physical pain, mental

anguish, and disability, and will continue to do so for the remainder of his life; has

suffered the loss of a normal life and will continue to do so for the remainder of his life;

has lost income that he otherwise would have earned and will continue to do so for the

remainder of his life; and has incurred reasonable expenses for necessary medical

treatment and will continue to do so for the rest of his life.

WHEREFORE, Plaintiff Michael Johnson requests that this Court enter judgment in his favor

for compensatory and punitive damages, together with interest, costs herein incurred, attorneys'

attorneys' fees, and all other just and proper relief.

## B. Second Cause of Action - Strict Products Liability Failure to Warn

221.   Plaintiffs incorporate by reference all preceding paragraphs as if fully set forth herein and
       further alleges as follows:

222.   At all times relevant to this claim, Defendants, Defendants' corporate predecessors, and
       others with whom they acted in concert were engaged in the business of designing,
       manufacturing, distributing, and selling pesticides, and designed, manufactured,
       distributed, and sold Paraquat intending or expecting that it would be sold and used in
       Georgia.

223.   Plaintiff Johnson was exposed to Paraquat sold and used in Georgia that
       Defendants, Defendants' corporate predecessors, and others with whom they acted in
       concert designed, manufactured, distributed, and sold intending or expecting that it would
       be sold and used in Georgia.

224.   When Defendants, Defendants' corporate predecessors, and others with whom they acted
       in concert designed, manufactured, distributed, and sold the Paraquat to which Plaintiff

was exposed, Defendants, Defendants' corporate predecessors, and others with whom they acted in concert knew or in the exercise of ordinary care should have known that when used in the intended and directed manner, or a reasonably foreseeable manner:

    a.  Paraquat was designed, manufactured, formulated, and packaged such that it was likely to be inhaled, ingested, and absorbed into the bodies of persons who used it, who were nearby while it was being used, or who entered fields or orchards where it had been sprayed or areas near where it had been sprayed; and

    b.  When inhaled, ingested, or absorbed into the bodies of persons who used it, who were nearby while it was being used, or who entered fields or orchards where it had been sprayed, or areas near where it had been sprayed, it was likely to cause or contribute to cause latent neurological damage that was both permanent and cumulative, and that repeated exposures were likely to cause or contribute to cause clinically significant neurodegenerative disease, including Parkinson's Disease, to develop long after exposure.

225.    The Paraquat that Defendants, Defendants' corporate predecessors, and others with whom they acted in concert designed, manufactured, distributed, and sold, and to which Michael Johnson was exposed was in a defective condition that made it unreasonably dangerous when it was used in the intended and directed manner or a reasonably foreseeable manner, in that:

    a. It was not accompanied by directions for use that would have made it unlikely to be inhaled, ingested, and absorbed into the bodies of persons who used it, who were nearby while it was being used, or who entered fields or orchards where it had been sprayed or areas near where it had been sprayed; and

        b. It was not accompanied by a warning that when inhaled, ingested, or absorbed into the bodies of persons who used it, who were nearby while it was being used, or who entered fields or orchards where it had been sprayed or areas near where it had been sprayed, it was likely to cause or contribute to cause latent neurological damage that was both permanent and cumulative, and that repeated exposures were likely to cause or contribute to cause clinically significant neurodegenerative disease, including Parkinson's Disease, to develop long after exposure.

226. This defective condition existed in the Paraquat that Defendants, Defendants' corporate predecessors, and others with whom they acted in concert designed, manufactured, distributed, and sold, and to which Michael Johnson was exposed when it left the control of Defendants, Defendants' corporate predecessors, and others with whom they acted in concert and was placed into the stream of commerce.

227. As a direct and proximate result of the lack of adequate directions for the use of and warnings about the dangers of the Paraquat manufactured, distributed, and sold by SAG, its corporate predecessors, and others with whom they acted in concert, Plaintiff Michael Johnson developed Parkinson's; has suffered severe and permanent physical pain, mental anguish, and disability, and will continue to do so for the remainder of his life; has suffered the loss of a normal life and will continue to do so for the remainder of his life; has lost income that he otherwise would have earned and will continue to do so for the remainder of his life; and has incurred reasonable expenses for necessary medical treatment and will continue to do so for the rest of his life.

228. As a direct and proximate result of the lack of adequate directions for the use of and warnings about the dangers of the Paraquat manufactured, distributed, and sold by

Chevron USA, its corporate predecessors, and others with whom they acted in concert, Plaintiff Michael Johnson developed Parkinson's Disease; suffered severe and permanent physical pain, mental anguish, and disability, and will continue to do so for the remainder of his life; has suffered the loss of a normal life and will continue to do so for the remainder of his life; has lost income that he otherwise would have earned and will continue to do so for the remainder of his life; and has incurred reasonable expenses for necessary medical treatment and will continue to do so for the rest of his life.

WHEREFORE, Plaintiff Michael Johnson requests that this Court enter judgment in his favor for compensatory and punitive damages, together with interest, costs herein incurred, attorneys' attorneys' fees, and all other just and proper relief.

### C. **Third Cause of Action - Negligence**

229.   Plaintiffs incorporate by reference all preceding paragraphs as if fully set forth herein and further alleges as follows:

230.   At all times relevant to this claim, Defendants, Defendants' corporate predecessors, and others with whom they acted in concert were engaged in the business of designing, manufacturing, distributing, and selling pesticides, and designed, manufactured, distributed, and sold Paraquat intended or expecting that it would be sold and used in Georgia.

231.   Plaintiff Johnson was exposed to Paraquat sold and used in Georgia that Defendants, Defendants' corporate predecessors, and others with whom they acted in concert designed, manufactured, distributed, and sold intending or expecting that it would be sold and used in Georgia.

232. The Paraquat that Defendants, Defendants' corporate predecessors, and others with whom they acted in concert designed, manufactured, distributed, and sold, and to which Plaintiff Michael Johnson was exposed was used in the intended/directed manner or a reasonably foreseeable manner.

233. At all times relevant to this claim, in designing, manufacturing, packaging, labeling, distributing, and selling Paraquat, and in acting in concert with others who did so, Defendants, Defendants' corporate predecessors, and others with whom they acted in concert owed a duty to exercise ordinary care for the health and safety of the persons whom it was reasonably foreseeable could be exposed to it, including Plaintiff Johnson.

234. When Defendants, Defendants' corporate predecessors, and others with whom they acted in concert designed, manufactured, packaged, labeled, distributed, and sold the Paraquat to which Michael Johnson was exposed, it was reasonably foreseeable, and Defendants, Defendants' corporate predecessors, and others with whom they acted in concert knew or in the exercise of ordinary care should have known, that when Paraquat was used in the intended, and directed manner, or in a reasonably foreseeable manner:

   a. It was designed, manufactured, formulated, and packaged such that it was likely to be inhaled, ingested, and absorbed into the bodies of persons who used it, who were nearby while it was being used, or who entered fields or orchards where it had been sprayed or areas near where it had been sprayed; and

   b. When inhaled, ingested, or absorbed into the bodies of persons who used it, who were nearby while it was being used, or who entered fields or orchards where it had been sprayed or areas near where it had been sprayed, it was likely to cause or contribute to cause latent neurological damage that was both permanent and

cumulative, and repeated exposures were likely to cause or contribute to cause

clinically significant neurodegenerative disease, including Parkinson's Disease, to

develop long after exposure.

235. In breach of the above-stated duty to Plaintiff Michael Johnson, Defendants,

Defendants' corporate predecessors, and others with whom they acted in concert

negligently:

    a. Failed to design, manufacture, formulate, and package Paraquat to make it

        unlikely to be inhaled, ingested, and absorbed into the bodies of persons who used

        it, who were nearby while it was being used, or who entered fields or orchards

        where it had been sprayed or areas where it had been sprayed;

    b. Designed, manufactured, and formulated Paraquat such that it was likely to cause

        neurological damage that was both permanent and cumulative, and repeated

        exposures were likely to cause clinically significant neurodegenerative disease(s),

        including Parkinson's Disease, to develop long after exposure;

    c. Failed to conduct adequate research and testing to determine the extent to which

        exposure to Paraquat was likely to occur through inhalation, ingestion, and

        absorption into the bodies of persons who used it, who were nearby while it was

        being used, or who entered fields or orchards where it had been sprayed or areas

        near where it had been sprayed;

    d. Failed to conduct adequate research and testing to determine the extent to which

        Paraquat spray drift was likely to occur including its propensity to drift, the

        distance it was likely to drift, and the extent to which Paraquat spray droplets were

        likely to enter the bodies of persons spraying it or other persons nearby during or

        after spraying;

e. Failed to conduct adequate research and testing to determine the extent to which Paraquat, when inhaled, ingested, or absorbed into the bodies of persons who used it, who were nearby while it was being used, or who entered fields or orchards where it had been sprayed, or areas near where it had been sprayed, was likely to cause or contribute to causing latent neurological damage that was both permanent and cumulative, and the extent to which repeated exposures were likely to cause or contribute to causing clinically significant neurodegenerative disease(s), including Parkinson's Disease, to develop long after exposure;

f. Failed to perform adequate testing to determine the extent to which Paraquat, when formulated or mixed with surfactants or other pesticides or used along with other pesticides, and inhaled, ingested, or absorbed into the bodies of persons who used it, who were nearby while it was being used, or who entered fields or orchards where it had been sprayed or areas near where it had been sprayed, was likely to cause or contribute to cause latent neurological damage that was both permanent and cumulative, and the extent to which repeated exposures were likely to cause or contribute to cause clinically significant neurodegenerative disease(s), including Parkinson's Disease, to develop long after exposure.

g. Failed to direct that Paraquat be used in a manner that would have made it unlikely to be inhaled, ingested, and absorbed into the bodies of persons who used it, who were nearby while it was being used, or who entered fields or orchards where it had been sprayed or areas near where it had been sprayed; and

h. Failed to warn that when inhaled, ingested, or absorbed into the bodies of persons who used it, who were nearby while it was being used, or who entered fields or

orchards where it had been sprayed or areas near where it had been sprayed, Paraquat was likely to cause or contribute to cause latent neurological damage that was both permanent and cumulative, and repeated exposures were likely to cause clinically significant neurodegenerative disease(s), including Parkinson's Disease, to develop long after exposure.

236. As a direct and proximate result of the negligence of SAG, its corporate predecessors, and others with whom they acted in concert, Michael Johnson developed Parkinson's Disease; has suffered severe and permanent physical pain, mental anguish, and disability, and will continue to do so for the remainder of his life; has suffered the loss of a normal life and will continue to do so for the remainder of his life; has lost income that he otherwise would have earned and will continue to do so for the remainder of his life; and has incurred reasonable expenses for necessary medical treatment and will continue to do so for the rest of his life.

237. As a direct and proximate result of the negligence of Chevron USA, its corporate predecessors, and others with whom they acted in concert, Michael Johnson developed Parkinson's Disease; has suffered severe and permanent physical pain, mental anguish, and disability, and will continue to do so for the remainder of his life; has suffered the loss of a normal life and will continue to do so for the remainder of his life; has lost income that he otherwise would have earned and will continue to do so for the remainder of his life; and has incurred reasonable expenses for necessary medical treatment and will continue to do so for the rest of his life.

WHEREFORE, Plaintiff Michael Johnson requests that this Court enter judgment in his favor for compensatory and punitive damages, together with interest, costs herein incurred, attorneys' attorneys' fees, and all other just and proper relief.

### D. Fourth Cause of Action - Breach of Implied Warranty of Merchantability

238. Plaintiffs incorporate by reference all preceding paragraphs as if fully set forth herein and further alleges as follows:

239. At all relevant times, Defendants, Defendants' corporate predecessors, and others with whom they acted in concert were engaged in the business of designing, manufacturing, distributing, and selling Paraquat, and other restricted-use pesticides and held themselves out as having special knowledge or skill regarding Paraquat and other restricted-use pesticides.

240. At all relevant times, Defendants, Defendants' corporate predecessors, and others with whom they acted in concert designed, manufactured, distributed, and sold Paraquat intending or expecting that it would be sold and used in the State of Georgia.

241. Michael Johnson was exposed to Paraquat that Defendants, Defendants' corporate predecessors, and others with whom they acted in concert designed, manufactured, distributed, and sold intending or expecting that it would be sold and used in the State of Georgia.

242. At the time of each sale of Paraquat to which Michael Johnson was exposed, Defendants, Defendants' corporate predecessors, and others with whom they acted in concert implied warranted that it was of merchantable quality, including that it was fit for the ordinary purposes for which such goods were used, pursuant to Ga. Code Ann. §11-2-314.

243. Defendants, Defendants' corporate predecessors, and others with whom they acted in concert breached this warranty in each sale of Paraquat to which Plaintiff Michael Johnson was exposed, in that it was not of merchantable quality because it was not fit for the ordinary purposes for which such goods were used, and in particular:

   a. It was designed, manufactured, formulated, and packaged such that it was likely to be inhaled, ingested, and absorbed into the bodies of persons who used it, who were nearby while it was being used, or who entered fields or orchards where it had been sprayed or areas near where it had been sprayed; and

   b. When inhaled, ingested, or absorbed into the bodies of persons who used it, who were nearby while it was being used, or who entered fields or orchards where it had been sprayed or areas near where it had been sprayed, it was likely to cause neurological damage that was both permanent and cumulative, and repeated exposures were likely to cause neurodegenerative disease(s), including Parkinson's Disease to develop long after exposure.

244. As a direct and proximate result of the breaches of implied warranty of merchantability by SAG, its corporate predecessors, and others with whom they acted in concert, Plaintiff Michael Johnson developed Parkinson's Disease; suffered severe and permanent physical pain, mental anguish, and disability, and will continue to do so for the remainder of his life; has suffered the loss of a normal life and will continue to do so for the remainder of his life; has lost income that he otherwise would have earned and will continue to do so for the remainder of his life; and has incurred reasonable expenses for necessary medical treatment and will continue to do so for the rest of his life.

245. As a direct and proximate result of the breaches of the implied warranty of merchantability by Chevron USA, its corporate predecessors, and others with whom they acted in concert, Plaintiff Michael Johnson developed Parkinson's Disease; suffered severe and permanent physical pain, mental anguish, and disability, and will continue to do so for the remainder of his life; has suffered the loss of a normal life and will continue to do so for the remainder of his life; has lost income that he otherwise would have earned and will continue to do so for the remainder of his life; and has incurred reasonable expenses for necessary medical treatment and will continue to do so for the rest of his life.

WHEREFORE, Plaintiff Michael Johnson requests that this Court enter judgment in his favor for compensatory and punitive damages, together with interest, costs herein incurred, attorneys' attorneys' fees, and all other just and proper relief.

### E. Fifth Cause of Action - Loss of Consortium

246. Plaintiffs incorporate by reference all preceding paragraphs as if fully set forth herein and further alleges as follows:

247. Plaintiffs Michael Johnson and Kathy Johnson are married and have been since prior to Michael's Parkinson's Disease diagnosis.

248. As a direct and proximate result of the defective and unreasonably dangerous condition of the Paraquat manufactured, distributed, and sold by SAG, its corporate predecessors, and others with whom they acted in concert, Plaintiff Kathy Johnson has been and is reasonably certain to be deprived in the future of the services, society, and companionship of her husband, Michael Johnson.

249. As a direct and proximate result of the lack of adequate directions for the use and warnings about the dangers of the Paraquat manufactured, distributed, and sold by SAG, its corporate predecessors, and others with whom they acted in concert, Kathy Johnson has been and is reasonably certain to be deprived in the future of the services, society, and companionship of her husband, Michael Johnson.

250. As a direct and proximate result of negligence of SAG, its corporate predecessors, and others with whom they acted in concert, Plaintiff Kathy Johnson has been and is reasonably certain to be deprived in the future of the services, society, and companionship of her husband, Michael Johnson.

251. As a direct and proximate result of the breaches of implied warranty of merchantability sold by SAG, its corporate predecessors, and others with whom they acted in concert, Kathy Johnson has been and is reasonably certain to be deprived in the future of the services, society, and companionship of her husband, Michael Johnson.

252. As a direct and proximate result of the defective and unreasonably dangerous condition of the Paraquat manufactured, distributed, and sold by Chevron USA, its corporate predecessors, and others with whom they acted in concert, Plaintiff Kathy Johnson has been and is reasonably certain to be deprived in the future of the services, society, companionship of her husband, Michael Johnson.

253. As a direct and proximate result of the lack of adequate directions for the use and warnings about the dangers of the Paraquat manufactured, distributed, and sold by Chevron USA, its corporate predecessors, and others with whom they acted in concert, Plaintiff Kathy Johnson has been and is reasonably certain to be deprived in the future of the services, society, companionship of her husband, Michael Johnson.

254.    As a direct and proximate result of negligence of Chevron USA its corporate

        predecessors, and others with whom they acted in concert, Plaintiff Kathy Johnson has

        been and is reasonably certain to be deprived in the future of the services, society,

        companionship of her husband, Michael Johnson.

255.    As a direct and proximate result of the breaches of implied warranty of merchantability

        sold by Chevron, its corporate predecessors, and others with whom they acted in concert,

        Plaintiff Kathy Johnson has been and is reasonably certain to be deprived in the future of

        the services, society, companionship of her husband, Michael Johnson.

WHEREFORE, Plaintiff Kathy Johnson requests that this Court enter judgment in her favor

for compensatory and punitive damages, together with interest, costs herein incurred, attorneys'

fees, and all other just and proper relief.

        **F.  Seventh Cause of Action - Punitive Damages**

256.    Plaintiffs incorporate by reference all preceding paragraphs as if fully set forth herein and

        further alleges as follows:

257.    Defendants' conduct as alleged herein was done with oppression, fraud, and malice.

        Defendants were fully aware of the safety risks of Paraquat. Nonetheless, Defendants

        deliberately crafted their label, marketing, and promotion to mislead farmers and

        consumers.

258.    This was not done by accident or through some justifiable negligence. Rather,

        Defendants knew they they could not profit by convincing the agricultural industry that

        Paraquat did not cause Parkinson's Disease, and the full disclosure of the true risks of

        Paraquat would limit the amount of money Defendants would make selling Paraquat in

        Georgia. Defendants' objective was accomplished not only through misleading labeling,

        but through a comprehensive scheme of selective fraudulent research and testing,

misleading advertising and deceptive omissions as more fully alleged throughout this pleading. Plaintiff Michael Johnson was denied the right to make an informed decision about whether to purchase, use, or be exposed to an herbicide, knowing the full risks attendant to that use. Such conduct was done with conscious disregard of Plaintiff's rights.

259. There is no indication that Defendants will stop their deceptive and unlawful marketing practices unless they are punished and deterred. Accordingly, Plaintiffs request punitive damages against the Defendants for the harms caused to Plaintiffs.

WHEREFORE, Plaintiffs respectfully request that this Court enter judgment in Plaintiffs' favor for compensatory and punitive damages, together with interest, costs herein incurred, attorneys' fees, and all other just and proper relief.

## V. **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs request this Court enter judgment in Plaintiffs' favor and against Defendants for:

a. Actual or compensatory damages in such amount to be determined at trail and provided by applicable law;

b. Exemplary and punitive damages sufficient to punish and deter the Defendants, and others from future fraudulent practices;

c. Pre-judgment and post-judgment interest;

d. Costs incurring reasonable attorneys' fees, court costs, and other litigation expenses; and

e. Any other relief the Court may deem just and proper.

## VI.    JURY TRIAL DEMAND

Plaintiffs demand a trial by struck jury on all the triable issues within this pleading.


Respectfully Submitted,


*/s/ Archie I. Grubb, II*
Archie I. Grubb, II (GA BAR 314384)
KENNETH S. NUGENT P.C.
1234 First Avenue, Suite 200
Columbus, Georgia 31901
Tel: (706) 223-5734
Fax: (706) 223-5747